Rodney A. SULLIVAN, Plaintiff,

v.

YOUNG BROTHERS AND COMPANY INCORPORATED, et al., Defendants.

Civ. No. 93–271–P–C.

United States District Court, D. Maine.

July 26, 1995.

John R. Bass, II, F. Jay Meyer, Thompson, McNaobe, Ashley & Bull, Portland, ME, for plaintiff.

Barry K. Mills, Hale & Hamlin, Ellsworth, ME, for defendant Young Brothers.

Richard L. Suter, Preti, Flaherty, Beliveau & Pachios, Portland, ME, for defendant Vernay Products Inc.

## DECISION AND ORDER

### GENE CARTER, Chief Judge.

Plaintiff Rodney Sullivan, by his insurer, seeks to recover for property damage to the fishing vessel SEA FEVER resulting from the sinking of that vessel on April 4, 1992. Plaintiff claims against Defendant Vernay Products, Inc. and Defendant Young Brothers and Company Inc. under the theory of strict liability (Count I), negligence (Count II), and breach of implied and express warranties (Count III).[1] Young Brothers cross-claimed against Vernay Products for indemnification and contribution (Docket No. 6) and Vernay Products has similarly cross-claimed against Young Brothers for indemnification and contribution (Docket No. 9). Subject matter jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(a).

## I. FACTS

SEA FEVER is a forty-foot, fiberglass hull lobster boat built by the Defendant and Cross–Claimant Young Brothers of Corea, Maine in 1989. SEA FEVER was purchased new from Young Brothers by Plaintiff Rodney Sullivan in February 1990 for $122,000. Tr. Vol. I at 76.[2] Sullivan added various items of gear and furnishings at a cost of approximately $10,000. Tr. Vol. I at 21. SEA FEVER was built with a wet exhaust system constructed, in part, of six-inch diameter Vernatube fiberglass marine wet exhaust tubing manufactured by Defendant Vernay Products. The fifteen-foot-long span of Vernatube was connected to the engine at the exhaust manifold by a flexible rubber hose and rigidly installed in the hull of the vessel by fiberglass where the Vernatube passed through the fish hold bulkhead, the lazarette bulkhead, and the transom.[3] Ex. 601. Aft of the manifold, the Vernatube was fiberglassed to each of the two bulkheads and the transom. The distance between the manifold and the fish hold-engine compartment bulkhead was about two feet, the length of the fish hold was eight feet, and the length of the lazarette was about five feet. Tr.Vol. III at 159. The Vernatube exhaust was supported by a ¾–inch marine plywood bracket lined with urethane rubber at about the midway point of the fish hold. Tr.Vol. III at 164. H & H Propeller Shop was Vernay's distributor in Maine and the parts supplier from which Young Brothers purchased the Vernatube installed aboard SEA FEVER.

Vernatube is sold in ten-foot lengths. To make up the necessary fifteen-foot length, Young Brothers fiberglassed together a ten-foot and a five-foot length of Vernatube, making, in effect, a single length of tube. Tr.Vol. III at 159. The Vernatube wet exhaust system installed in the SEA FEVER was installed in conformity with generally accepted methods of installation among builders of similar vessels in Maine. Tr. Vol. I at 171–75, 312–13; Tr.Vol. II at 11–14, 33–34, 42, 45–46, 50–51, 106–08. SEA FEVER was equipped with a Rule 1500–gallon automatic bilge pump. This pump, capable of discharging up to 1500 gallons of water per hour, could be operated manually or automatically. Tr.Vol. III at 169–70, 172–73.

Plaintiff operated SEA FEVER as a commercial lobster vessel during the 1990 fishing season without significant problems. Tr. Vol. I at 21–22. During early 1991, a crack developed in the portion of the Vernatube exhaust

---

1. Plaintiff's Complaint also made claims against H & H Propeller Shop under the theory of strict liability (Count I) and breach of implied and express warranties (Count III). Those claims, along with the cross-claims and third-party claims, by and against H & H, were dismissed by stipulation of the parties before trial commenced. See Stipulation of Dismissal (Docket No. 46).

2. References to trial transcript are based upon the date of the transcript for each of the days of the four-day trial as follows:

June 20, 1994 = Tr.Vol. II
June 21, 1994 = Tr.Vol. III
June 22, 1994 = Tr.Vol. IV

3. The bulkheads were comprised of ¾–inch marine plywood. The holes in the bulkheads and transom were approximately ¼ inch larger than the diameter of the Vernatube. A layer of deck putty was applied between the exterior of the Vernatube and the inside of the bulkhead hole, and the tube was fiberglassed to the bulkheads and transom. Tr. Vol. III at 162–63.

located in the lazarette, permitting water to enter the vessel, to the point of near sinking. Tr.Vol. I at 22–24, 82–84. Upon being notified of the crack, Colby Young, part-owner and vice president of Young Brothers, repaired the crack by fiberglassing over the break. Tr.Vol. I at 84. Colby Young then notified H & H Propeller of the crack in the Vernatube. Tr.Vol. III at 194. Neither H & H nor Colby Young notified Vernay of the crack.[4] Tr.Vol. III at 110–11, 122–23, 192–94. The cause of this crack was never investigated or discovered. Tr.Vol. I at 85; Tr. Vol. II at 179–80; Tr.Vol. III at 192–94.

After the repair, SEA FEVER was operated with no further problems until it sank in April 1992. Tr.Vol. I at 38, 116. Plaintiff fished the 1991 season until January 1992, when he hauled all his traps for the winter. Tr.Vol. I at 71, 110–117. Thereafter, SEA FEVER lay tied to the dock at Great Boat Club in Eliot, Maine until March 1992, when it was hauled for routine maintenance, including bottom painting. During the time SEA FEVER was out of the water, the exhaust system was not specifically observed. Tr.Vol. I at 52, 67–71, 118, 149–50. On March 17, 1992, Edward S. Blackmore, a marine surveyor appointed by Plaintiff's marine hull insurance company, surveyed SEA FEVER while it was afloat at the dock. Blackmore found the vessel to be in "A–1" condition with a fair market value of $130,-000. Ex. 161C. The inspection included observation of the Vernatube exhaust. At the time of the inspection SEA FEVER was not loaded and, thus, the exhaust tube did not have any water in it.[5] Nothing unusual was noted about the condition of the Vernatube. Tr.Vol. I at 167–69, 179. Blackmore observed no fractures, no discoloration, and no staining or other evidence of failure in the Vernatube. Tr.Vol. I at 167–70, 179, 192, 196.

SEA FEVER was not operated during the period from January 12, 1992, to April 4, 1992. On April 4, 1992, Plaintiff and his sternman, Kevin Wood, made an eight-to-ten-mile trip aboard SEA FEVER, picking up approximately eighty lobster traps, and returned to the slip at Great Cove Boat Club. Tr. Vol. I at 83. They tied SEA FEVER to the dock at about 1:00 p.m. and went home for the day. Due to the weight of the lobster traps, the vessel was trimmed down by the stern and the end of the exhaust discharge port was several inches under water. Hence, the Vernatube had water in it. Tr.Vol. I at 43–44, 88–90, 116–17, 123; Tr.Vol. III at 200–01. SEA FEVER was left with the automatic bilge pump switch in the "off" position rather than the "automatic" one. Tr.Vol. II at 82, 95; Tr.Vol. III at 136–37, 180–81; Ex. 950 at 5. At approximately 7:30 p.m. on the same day, Plaintiff was notified that SEA FEVER had sunk at the dock.[6] Tr.Vol. I at 45. Shortly thereafter, Plaintiff retained Wayne Godfrey, a salvage diver from D & G Diving Services, to raise the vessel. SEA FEVER was surveyed by Werner Splettstoesser of Marine Safety Consultants on behalf of Plaintiff's insurer. Tr.Vol. II at 140.

## II. DISCUSSION

The cause of the sinking of SEA FEVER was a crack in the Vernatube located a few inches forward of the bulkhead between the lazarette and fish hold. Tr.Vol. II at 95–96, 176; Exs. 201(5), 601. The full-circumference crack in the Vernatube in 1992 was a fatigue failure caused by tension stresses over time exceeding the axial strength of the tube. Tr.Vol. IV at 115, 134, 157; Tr.Vol. II at 190. Witnesses, including the vice president and general manager of Vernay; a representative of H & H Propeller; experienced boat builders; and marine surveyors, knew of no other instance in which a Vernatube had cracked under circumstances such as were involved in this action. Tr.Vol. IV at 44; Tr.Vol. III at 112–13, 168; Tr.Vol. II at 52–54. The question to which most of the testimony was directed was whether the crack had been caused by a defective section

---

4. There was no evidence that Plaintiff gave Vernay notice of the crack.

5. When SEA FEVER is loaded the exhaust port on the transom is submerged, permitting water to enter the exhaust tube.

6. The boat was about 90% to 95% submerged. Tr. Vol. III at 135.

of Vernatube or by improper installation of the exhaust system.

■ Initially, Defendant Vernay argues that Plaintiff's tort-related claims for negligence and strict liability should be dismissed because Plaintiff has sustained only economic loss, and it is a well recognized legal concept that economic losses may be recovered only in contract. Although, as Defendant Vernay correctly points out, the damages in this case are purely economic in nature, the economic loss doctrine is not a "well recognized legal concept" in Maine law. As this Court stated when faced with this question in *Inhabitants of Saco v. General Electric Co.*, 779 F.Supp. 186, 196 (D.Me.1991), "[w]hile the Law Court at one point might have adopted the general rule barring recovery in negligence for purely economic loss, it seems clear that now it is more leery of such 'artificial devices.'" Because the Law Court has not decided this issue and finding the reasoning in *General Electric* still applicable, the Court concludes that economic loss is recoverable under Maine law in negligence and strict liability.

## A. STRICT PRODUCTS LIABILITY

Plaintiff claims that Vernay manufactured and sold a defective section of Vernatube. Plaintiff also contends that Young Brothers improperly designed and installed a rigid exhaust system. Defendant Vernay responds that the Vernatube used to construct the wet exhaust system on SEA FEVER was not defective, but, rather, the installation of the rigid exhaust system was the cause of the failed section of Vernatube. Defendant Young Brothers counter that the failure resulted from a defective section of Vernatube.

Defendant Vernay Products is a manufacturer of various fiberglass components of marine wet exhaust systems.[7] Tr.Vol. IV at 12. Between 1987 and 1993, Vernay sold approximately 66,000 feet of six-inch Vernatube. Total Vernatube sales of all diameters during this same period was approximately 448,000

7. Vernay does not sell complete wet exhaust systems. It manufactures only certain component parts to marine wet exhaust systems.

8. Vernay has experimented with the wind angle and has apparently determined that the wind

feet. Tr.Vol. IV at 15, 66–67. Vernatube is manufactured by winding strands of fiberglass around a mandrel. The angle at which the strands are wound determines the hoop and longitudinal strength of the tubing. The nature of the angle is such that as hoop strength is increased, axial strength is decreased and vice versa.[8] The representative of Vernay testified that the primary reason that it cuts Vernatube into ten foot lengths for sale is that it would be considered dangerous or compromising to the overall safety of the system if there were lengths in excess of ten feet. Tr.Vol. IV at 33–34. In twenty-two years of production, Vernay has never received a complaint related to Vernatube cracking before this instance. Tr.Vol. IV at 44, 194.

Product liability claims are governed by 14 M.R.S.A. § 221, which provides, in part:

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property.... This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Plaintiff's expert, Frederick Hochgraf, testified that the section of Vernatube was substandard in three ways: (1) the interior of the failed section of Vernatube was characterized by "little bubbles, pock[ ] marks," causing a porous surface that is subject to greater degradation from water and exhaust vapor; (2) the walls of the failed Vernatube were thinner than Vernay claimed in the brochure specifications; and (3) contrary to Vernay's representation, the Vernatube did not possess "maximum" hoop and longitudinal strength.

angle actually utilized is the best angle that Vernay can achieve which gives maximum compromise to both hoop and axial strengths within the limitations and constraints of its machinery and manufacturing process. Tr. Vol. IV at 17–23.

Analysis of the section of the Vernatube found evidence of porosity on the inner surface. Tr.Vol. III at 31–33. Hochgraf testified that the interior of the failed section of Vernatube was characterized by "little bubbles, pock[ ] marks," creating a porous surface that was subject to greater degradation from water and exhaust vapor.[9] Hochgraf attributed the porous surface to "[p]oor workmanship in the lay up" of the Vernatube. Tr.Vol. II at 181–83. He stated that the porous surface "caused a ... marginally greater decrease in strength." Tr.Vol. II at 185. Hochgraf testified that the porous inner surface resulted in an accelerated weakening of the tubing. Hochgraf did not make any comparative tests between the Vernatube from the SEA FEVER and exemplar pieces of Vernatubing. Tr.Vol. III at 29–31.

Vernay's expert, Donald Allison, examined the failed section of Vernatube for void content which measures how much air is trapped either in the body or on the surface and is related to porosity. Tr.Vol. IV at 118. Allison concluded that the failed section of Vernatube did not have a high void content, but he did not refute Plaintiff's expert regarding porosity on the inner surface. Tr.Vol. IV at 118–120. Allison testified that the failed piece of Vernatube was not significantly different from the exemplar piece of Vernatube. According to Allison, there was no significant difference in void content, glass content, or tensile strength among the five-foot length of Vernatube used aboard SEA FEVER, the ten-foot failed section of Vernatube used aboard SEA FEVER, and the exemplar piece of tube. Tr.Vol. IV at 120–22, 124, 127–29.

Allison testified that his visual examination under magnification revealed that the cracks in the Vernatube were progressive, occurring over time, as a result of debonding between strands rather than of fibers cracking from environmental events. Tr.Vol. III at 115–16.

However, he found no specific defect, in either the design of the tube or in its manufacture. Tr.Vol. III at 146–47. Allison testified that the strength of the tube is attributable to its fiber rather than to the resin. Tr.Vol. II at 164. Allison did not agree that loose strands of fiber may indicate areas of defective bonding. However, John Ford, vice president and general manager of Vernay, conceded on cross-examination that evidence of multiple cracks may be due to "poor wetting or insufficient contact of the resin [with] the fibers," and that such a condition could lead to a crack. Ford also agreed that loose fibers permit penetration by water, further weakening the tube. Tr.Vol. III at 83–85. Hochgraf testified that any local failure, such as a delamination, can be a cause of eventual failure of the tube. Tr.Vol. II at 203. It follows that where the fibers are broken, the tube is exposed to continual weakening.

Although there is no recognized standard for porosity or void content for wet exhaust tubing, Vernay randomly tests its tubes for porosity. Ford testified that no tube has ever failed this test. Tr.Vol. IV at 31–32. It is unclear what standard Vernay uses when assessing the results of the porosity tests. Nevertheless, the Court finds that the porosity of the inner surface of the Vernatube and the poor wetting or insufficient contact of the resin with the fibers was a defect in the Vernatube and contributed to the Vernatube's failure.

With respect to wall thickness, the testimony revealed that the walls of the failed Vernatube were thinner than Vernay claimed in the brochure specifications—averaging 0.13 inches rather than 0.148 inches.[10] Hochgraf testified that a reduction in wall thickness causes reduction in the ability of the tube to withstand stress. Tr.Vol. II at 178–79. Hochgraf testified that a ten-percent decrease in wall thickness would cause a twenty-percent increase in vulnerability to stress, which

9. Plaintiff's expert examined the failed section of Vernatube for surface porosity, not void content or internal porosity, and concluded that the inner surface porosity would decrease the strength of the tube. Tr. Vol. III at 31–35; Ex. 970. Plaintiff's expert examined the tube under a low-power microscope at a magnification power of ten. Tr. Vol. III at 31.

10. The Vernatube product information sheet was written by John Ford. Ex. 95A. This product information sheet was printed in 1988. Tr.Vol. IV at 29–30.

makes a "substantial difference on whether or not failure occurs in a reasonable time." Tr.Vol. III at 10, 12. Although not specifically addressing the representation regarding wall thickness from Vernay's product brochure, Defendant Vernay's expert, Allison, testified that the piece was not significantly different from the exemplar piece of Vernatube. Despite the favorable comparison to the exemplar piece of Vernatube, the Court finds that the diminution in wall thickness was a defect and contributed the Vernatube's failure.

Finally, Plaintiff argues that the orientation of the Vernatube fibers resulted in a product that provided inadequate axial strength in the application for which the tubing was intended. Vernay made the following representation in its product brochure regarding Vernatube:

> The orientation of the glass fibers with respect to the product geometry is such that near maximum hoop and longitudinal strengths are attained.

Ex. 95A. Contrary to Vernay's representation of "maximum hoop and longitudinal strengths," Hochgraf found the tube to have a superfluous degree of hoop or bursting strength but low longitudinal strength. Tr. Vol. II at 186–90. According to Hochgraf, Vernay's representations were inaccurate. Tr.Vol. II at 186–90. The Court also finds that the low degree of longitudinal strength was a defect and contributed to the Vernatube's failure in this case.

■ In sum, the Court finds that the ten-foot section of Vernatube used in the SEA FEVER's wet exhaust system was defective. SEA FEVER developed at least two cracks in its exhaust tubing during a two-year period. The Court is able to rule out other claimed reasons for the failure: there is no evidence of owner misuse, Tr.Vol. I at 37, 137; Tr.Vol. II at 169–70; Tr.Vol. III at 199–200; Tr.Vol. IV at 127, 163, and no indication of Vernatube failures in boats similarly constructed. The testimony at trial clearly established that hundreds of boats of similar design have been constructed with this type of rigid exhaust system without one known failure. *See infra* section IIB(2). The Court finds that the rigid installation of SEA FEVER's exhaust system was not a cause of the failure in the Vernatube. Accordingly, Young Brothers cannot be found strictly liable for its installation of SEA FEVER's wet exhaust system.

The testimony regarding the porosity, wall thickness, and longitudinal strength clearly proves that the section of Vernatube was defective rendering the product unreasonably dangerous for use. Inspection and analysis of the failed Vernatube have revealed several cracks, delaminations, and areas of prospective failure, all located in the aft ten-foot section of the tube. In addition to the point of failure, examination of the Vernatube reveals one area of debonding—a place where strands of fiber had come loose.[11] Ex. 205(27). The existence of multiple failures and imperfections within that single ten-foot section of Vernatube, notwithstanding the product's known track record of problem-free similar installations in hundreds of other vessels, supports the conclusion that the SEA FEVER sank because this particular length of tube, rather than its installation, was defective.

Plaintiff finally contends that Vernay failed to provide adequate instructions for the installation and use of its product. Even if a product is faultlessly made, it may still be found defective under 14 M.R.S.A. § 221 if it is "unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied without such warning." *Walker v. General Electric Co.*, 968 F.2d 116, 119 (1st Cir.1992) (citing *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 196 (Me.1990)); *Pottle v. Up–Right, Inc.*, 628 A.2d 672, 674–75 (Me.1993); *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534, 538 (Me.1986); Restatement (Second) of Torts § 402A comment j (1965). A product liability action for failure to warn requires a

---

11. Inspection of the ten-foot section of the Vernatube revealed six points of weakening or failure, specifically: (1) a splinter delamination at the transom, (2) a crack in the lazarette area, (3) the 1991 repaired crack in the lazarette area, (4) a full-circumference crack in the fish hold areas and (5 and 6) two points of discoloration indicating exhaust gas leakage in the fish hold area. Tr. Vol. II at 93–101; Tr. Vol. IV at 68–69; Tr. Vol. IV at 111–112.

three-part analysis: "(1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether the inadequate warning proximately caused the plaintiff's injury." *Pottle,* 628 A.2d at 675. Plaintiff suggests that if adequate instructions had been supplied, Young Brothers would have understood that there were dangers to using the Vernatube in a rigid installation that exposed the tubing to axial stresses beyond its strength.

■■■ A duty to warn arises when the manufacturer knows or should know of a danger sufficiently serious to require a warning. *Id.* It is not questioned that Vernay knew that there were dangers involved with rigid installation of Vernatube. John Ford, engineer from Vernay, testified that if portions of the exhaust system or exhaust train were rigidly affixed to structural members of the wall, it could have caused greater than normal stresses on portions of the exhaust system and that rigid installation of the Vernatube was not recommended. Tr.Vol. IV at 93. Vernay contends that its product brochure did warn its customers of the danger in the use of Vernatube in a rigid installation. The only relevant instruction, relied upon by Vernay, regarding the proper installation of Vernatube provides:

> *Connections to other elements of the exhaust train should be by means of flexible rubber exhaust hose with a minimum overlap of one diameter.* Two stainless steel clamps should be used for each connection. VERNATUBE should be located a minimum of 3 feet downstream from the point of injection of the coolant water into the exhaust train to permit adequate cooling of the exhaust gasses prior to their impact on the tubing.

Ex. 95A (emphasis added).

Relying on this statement in its product brochure, Vernay claims that it did warn against the use of the tubing in a rigid exhaust construction. The Court finds that this warning is reasonably subject to at least one other interpretation and, thus, is inadequate. It is reasonable to construe the instruction to require a flexible connection only at points of conjunction with "other elements of the exhaust train." The Court does not consider that the bulkheads, transom, and other sections of Vernatube to be "other elements of the exhaust train." The warning should state clearly that all connections to other sections of Vernatube or to surrounding or supporting components of the wet exhaust system should be made with a flexible hose connection. Alternatively, a warning should have been given not to join more than a ten-foot span of Vernatube without using a flexible hose connection between sections. According to Vernay's testimony the reason that Vernatube is sold in ten-foot lengths is because it is not safe to use in longer sections without a flexible connection. Vernay did not include a specific warning to avoid rigid installation in its product brochure. Tr.Vol. IV at 61.

■ However, as the Court has already discussed, the rigid installation of SEA FEVER's exhaust system was not a cause of the failure in the Vernatube. Therefore, despite the inadequate warning, Vernay cannot be held strictly liable for its failure to provide a proper warning to avoid such rigid installation because the rigid installation was not the cause of the failure.

## B. NEGLIGENCE

■ In order to show negligence under Maine law, Plaintiff must show (1) a duty owed to Plaintiff by Defendant; (2) a breach of that duty; and (3) that the breach was the actual and legal cause of Plaintiff's injury. *Parker v. Harriman,* 516 A.2d 549, 550 (Me. 1986); *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 938 (Me.1982). The Court will discuss the alleged negligence of each party in turn.

### 1. Vernay Products

■ Defendant Vernay had a duty to manufacture for sale a safe and reliable product for installation into marine wet exhaust systems. For the same reasons discussed above, the Court finds that Vernay breached its duty when it sold the substandard and defective section of Vernatube. The defective section of Vernatube was the cause of the vessel sinking. Accordingly, Defendant Vernay is liable to Plaintiff for its negligence.

## 2. Young Brothers

■ There is no question that Young Brothers had a duty to design and build a wet exhaust system that would withstand normal marine use. In assessing whether Young Brothers breached its duty of care by designing and installing this type of rigid exhaust system, the Court looks to the customs[12] and standards within the boat building profession. This approach is supported by the Restatement, which provides:

> If the actor does what others do under like circumstances, there is at least a possible inference that he is conforming to the community standard of reasonable conduct; and if he does not do what others do, there is a possible inference that he is not so conforming. In particular instances, where there is nothing in the situation or in common experience to lead to the contrary conclusion, this inference may be so strong as to call for a directed verdict, one way or the other, on the issue of negligence.

Restatement (Second) of Torts § 295A Comment b (1965).

■ The evidence at trial established, without question, that the installation of Vernatube in SEA FEVER was typical of its installation in similar vessels built in Maine. Edward Blackmore, an experienced lobsterman and former president of the Maine Lobstermen's Association who has done more than 100 marine surveys, testified that the Vernatube installation in SEA FEVER was standard. Tr.Vol. I at 171–75. Blackmore opined that the rigid connections to the bulkheads "would offer good support for the whole tube so that vibration, perhaps, wouldn't let it chafe or wear in any way. It was fastened really solid the way it should be." Tr.Vol. I at 175. Weldon Leonard, owner of M.D.I. Boatworks, testified that he could not recall ever installing a length of Vernatube that had not been fiberglassed to the bulkheads through which it passed.

Leonard routinely installs Vernatube in the same manner as Young Brothers, and so do all other boat builders with whom he is familiar, including Lee Wilbur Company, John Williams, and Ellis Boat. Tr.Vol. II at 11–14, 33–34. In fact, Leonard testified that he had been "in every boatyard up and down the Maine coast" and he had "never seen it done differently." Tr.Vol. II at 42. Boats made by M.D.I. Boatworks with similarly installed wet exhaust systems routinely pass Coast Guard inspection. Tr.Vol. II at 45–46.

Timothy Staples, general manager of Duffy & Duffy Custom Yacht Building, estimated that his company had built approximately 150 boats with Vernatube rigidly installed in the same fashion as it was installed in SEA FEVER. Tr.Vol. II at 50–51. Jim Foley, who repaired SEA FEVER for Plaintiff, testified that such a wet exhaust system was a "standard installation." Tr.Vol. I at 212–13. Finally, according to James Sanner, a representative of H & H Propeller and Vernay's distributor in Maine, approximately 90% of boat builders install Vernatube in the same way as it was installed in SEA FEVER.

Moreover, before this litigation, Young Brothers had no reason to believe that the generally accepted Vernatube installation technique was hazardous. Since the introduction of Vernatube in 1987, Young Brothers has constructed about forty fishing vessels with wet exhaust systems rigidly installed the same as aboard SEA FEVER. Tr. Vol. III at 156. Colby Young has fished with a twin of SEA FEVER for five years without a problem. Tr.Vol. III at 168. Young Brothers' boats with identical installation of Vernatube routinely pass Coast Guard inspections. Tr.Vol. III at 175. None of the witnesses, including the manufacturer, distributor, builders, engineers, and marine surveyors, were aware of an instance when Vernatube had cracked during normal use. However, two boats built by Duffy & Duffy Marine have experienced Vernatube cracks for explainable and unrelated reasons.[13]

---

**12.** *See* Restatement (Second) of Torts § 295A (1965), which defines "custom" as follows:

> In determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, but are not controlling

where a reasonable man would not follow them.

**13.** Tim Staples, manager of Duffy & Duffy, testified that one failure occurred after a vessel's owner left off the seacock, running the boat and

Based on the industry's trouble-free experience with installations similar to that in SEA FEVER, there is no basis to hold that due care required departure from the universally accepted standard.[14]

As observed by the court in *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, *Eastern Transp. Co. v. Northern Barge Corp.*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), the court should not find that the "whole [boat building] calling may have unduly lagged" without good reason. Based on the industry's trouble-free experience with installations similar to SEA FEVER's and in the absence of clear instructions or warnings to the contrary from the manufacturer, the Court cannot conclude that Young Brothers failed to exercise due care when designing and installing the SEA FEVER's wet exhaust system. Based on the custom and practice in the boat building industry, it was reasonable for Young Brothers to have designed the rigid wet exhaust system aboard SEA FEVER. Moreover, as the Court has found *supra*, the type of design and installation of the wet exhaust system by Young Brothers was not the cause of the failure in the Vernatube.

### 3. Rodney Sullivan

Both Vernay and Young Brothers raise the affirmative defense of Plaintiff's comparative negligence. 14 M.R.S.A. § 156. *See* Defendant Vernay's Answer (Docket No. 2) and Defendant Young Brothers' Answer (Docket No. 4). At trial, the testimony disclosed that it is a generally accepted practice among fishermen, like Plaintiff, to leave the bilge pump switch in its "automatic" position when the boat is unattended. Tr.Vol. I at 176–77; Tr.Vol. II at 66 Tr.Vol. III at 170–71. Contrary to this generally accepted practice, Sullivian usually left the bilge pump in the "off" rather than "automatic" position. Tr.Vol. I at 150–51; Tr.Vol. II at 82. On April 4, in accordance with his practice, Sullivan put the bilge pump in the off position when he left the vessel.[15] The evidence at trial also revealed that Plaintiff knew that there was another crack in the Vernatube exhaust which he had intended to repair. Tr.Vol. III at 138, 152–53.

With the knowledge of the crack in the exhaust tube, which caused a near loss of the vessel in 1991, and the existing crack he had meant to fix, Plaintiff nevertheless left SEA FEVER heavily loaded with lobster traps, unattended at the dock, with the bilge pump in the off position. No good reason is assigned in the evidence not to employ the automatic feature of the bilge pump. Leaving the automatic bilge pump in the off position under these conditions is contrary to good seamanship and common sense. Although it was not the cause of SEA FEVER's sinking, the Court finds that if the pump had been left on "automatic," the vessel would have stayed afloat long enough for measures to have been taken which would have prevented some, if not all, of the dam-

the wet exhaust system dry. Tr. Vol. II at 52. The other failure was attributed to lack of support over a long run of Vernatube. Tr. Vol. II at 53–54; Tr. Vol. III at 113. John Ford, former president of Vernay Products, testified that in the twenty-two years he had been involved with Vernay and the tens of thousands of miles of Vernatube produced, Sullivian's complaint of cracking was the first he had received. Tr. Vol. IV at 44.

14. The Court makes this finding despite the expert engineering testimony which revealed that this is an unsafe design and construction. Allison opined, to a reasonable degree of scientific certainty, that the cause of the crack in the Vernatube aboard SEA FEVER was that the loads resulting from the installation of the Vernatube into the structure of the boat were higher than the material could withstand. Tr. Vol. IV at 134–35. Vernay purports to have prior knowledge that rigid installation of Vernatube, as by

fiberglassing it to bulkheads and by creating lengths longer than ten feet by fiberglassing together ends of two or more spans, may create a hazardous condition. The hazardous condition results from subjecting the tube to vibration, shock, and natural movement of the vessel which the Vernatube is not designed to withstand.

15. Sullivan testified that he did not know if the bilge pump was on or not on April 4, 1992. Tr. Vol. I at 42. The Court bases its conclusion on the fact that when SEA FEVER was raised, Splettstoesser found that the automatic bilge pump was in the "off" position. Further, the Court finds that Plaintiff was aware that the bilge pump was off because he asked the salvage diver to turn it to "automatic" before raising the vessel so that he would not have a problem with the insurance company. The diver declined to do so. Tr. Vol. I at 151; Tr. Vol. III at 136, 180–81.

age. Tr.Vol. III at 98–100; 168–69. Accordingly the Court finds Plaintiff partially responsible for the damage sustained by SEA FEVER.

## C. BREACH OF WARRANTIES

 Plaintiff claims that Vernay and Young Brothers breached both express and implied warranties made to him. Both Vernay and Young Brothers respond that they did not breach any express or implied warranties made to Plaintiff. The Court has been unable to identify what express warranty, or warranties, were made by Young Brothers when SEA FEVER was built for, and sold to, Sullivan. Moreover, because the Court finds that the standard method of rigid installation used by Young Brothers for the wet exhaust system was not the cause of the failure of the Vernatube, Plaintiff cannot prevail on his claim of breach of implied warranty of merchantability or fitness for a particular purpose.

### 1. Express Warranty

 Pursuant to 11 M.R.S.A. § 2–313, an express warranty is created by a seller whenever that seller makes any representation with regard to the sold product. In this case, Plaintiff contends that Vernay's representations were erroneous on three points: (1) the Vernatube had insufficient nominal wall thickness; (2) the Vernatube was porous on the inner surface, affecting the tube's overall integrity; and (3) the longitudinal strength was insufficient for the application and could have been increased through changes in the tube's manufacture.

 As the Court has already discussed at length, it is satisfied that the deficiency in the nominal wall thickness and the substandard longitudinal strength were not what Vernay expressly warranted in its product brochure. In addition, the porous nature of the inner surface of the Vernatube contributed to the weakening of the fibers and the fatigue crack which caused the vessel to sink. The breach of these express warranties was collectively the cause of the failure of this section of Vernatube.

### 2. Implied Warranty

Pursuant to the Maine Uniform Commercial Code, a seller makes an implied warranty that the goods are merchantable and fit for the ordinary purpose for which such goods are used. 11 M.R.S.A. § 2–314. Section 2–314 provides that

(1) [A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

(2) Goods to be merchantable must at least be such as

(a) Pass without objection in the trade under the contract description; and

. . . . .

(c) Are fit for the ordinary purposes for which such goods are used; . . . .

Similarly, 11 M.R.S.A. § 2–315 provides that where a seller has reason to know of a particular purpose for which the goods are required, that seller warrants that the goods are fit for that purpose unless the warranty of fitness is excluded or modified pursuant to 2–316. Vernay does not contend that any exclusions or modifications are applicable to the instant case.

 For the reasons already discussed regarding the defective nature of the section of Vernatube, the Court finds that Vernay breached its implied warranty of merchantability. A piece of Vernatube which evidences multiple cracks and flaws after standard rigid installation and use cannot pass "without objection in the trade under the contract description" and was not "fit for the ordinary purposes for which [Vernatube is] used." 11 M.R.S.A. § 2–314(2)(a) and (c). The defect rendered the tube below merchantable quality. In addition, although apparently unaware, prior to this lawsuit, of the rigid method of installation of Vernatube in marine wet exhaust systems, Vernay knew, as a general matter, the purposes for which the Vernatube would be used. Tr. Vol. IV at 44–45. Therefore, by selling the defective section of Vernatube, Vernay also breached its implied warranty of fitness for a particular purpose. 11 M.R.S.A. § 2–315.

Defendant Vernay contends that it should not be held responsible for the damages be-

cause Plaintiff failed to comply with the notice requirements set forth in 11 M.R.S.A. § 2–607(3). It is undisputed that approximately one year prior to the 1992 sinking of the SEA FEVER, Plaintiff experienced a similar crack in the Vernatube which allowed water to infiltrate the vessel's holds. Neither Plaintiff nor Defendant Young Brothers provided Defendant Vernay with any notice of the 1991 crack. Although Young Brothers did notify H & H Propeller, H & H did not notify Vernay. Defendant Vernay contends that since neither Plaintiff nor Defendant Young Brothers gave notice to Vernay of the 1991 crack within a reasonable time after discovery of such crack, which would have provided an opportunity to offer a cure, *see* 11 M.R.S.A. § 2–605, Plaintiff is barred from any remedy.

■■■■ Despite Defendant Vernay's assertion to the contrary, the majority of courts that have considered this question have held that buyers need only notify their immediate sellers. *Owens v. Glendale Optical Co.*, 590 F.Supp. 32 (S.D.Ill.1984) (applying Illinois law); *Cooley v. Big Horn Harvestore Systems, Inc.*, 813 P.2d 736 (Colo.1991); *Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984); *Tomczuk v. Cheshire*, 26 Conn.Supp. 219, 217 A.2d 71, 73 (1965); *Goldstein v. G.D. Searle & Co.*, 62 Ill.App.3d 344, 19 Ill.Dec. 208, 211, 378 N.E.2d 1083, 1086 (1978); *Carson v. Chevron Chemical Co.*, 6 Kan.App.2d 776, 635 P.2d 1248, 1256 (1981); *Firestone Tire & Rubber Co. v. Cannon*, 53 Md.App. 106, 452 A.2d 192, 195–98 (1982), *aff'd per curiam*, 295 Md. 528, 456 A.2d 930 (1983); *Church of Nativity of Our Lord v. WatPro, Inc.*, 474 N.W.2d 605, 609–610 (Minn.Ct.App.1991); *Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 361 (Mo.Ct.App.1989); *Seaside Resorts v. Club Car, Inc.*, 308 S.C. 47, 416 S.E.2d 655, 663 (Ct.App.1992) (applying N.C. law); *Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 888 (Tex.Civ.App.1979); *contra Redfield v. Mead, Johnson & Co.*, 266 Or. 273, 512 P.2d 776, 781 (1973); *Western Equipment Co. v. Sheridan Iron Works*, 605 P.2d 806, 810–11 (Wyo.1980); *Morrow v. New Moon Homes*, 548 P.2d 279, 292 (Alaska

1976). Under 11 M.R.S.A. § 2–607(3)(a) "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." The definition of "seller" is "a person who sells or contracts to sell goods." 11 M.R.S.A. § 2–103(d). The Court concludes that the Maine Law Court would follow the reasoning of the majority of courts and conclude that for purposes of a breach of warranty claim, it is not necessary to give notice to remote sellers. Accordingly, Plaintiff's notice to Young Brothers was sufficient to satisfy the requirements of 11 M.R.S.A. § 2–607(3).

■■■■ Defendant Vernay also contends that judgment should be entered in its favor because Plaintiff's insurers made payments to Plaintiff as "volunteers" and were under no contractual obligation to do so. Plaintiff's marine insurance policy provides in part:

> Touching the adventures and perils which this Company is contented to bear and take upon itself, they are of the waters named herein, fire, lightening, earthquake, sailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein. . . .
>
> Provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them.

Ex. 165. Acknowledging that an insurer can be characterized as a volunteer only if it pays its insureds when it *clearly* has no obligation to do so under its policy, Vernay contends that Plaintiff's negligence[16] constitutes a want of due diligence relieving the insurer from *any* duty to pay Plaintiff's claim under its policy. *See* J. Couch, *Cyclopedia of Insurance Law* § 61.55–61.57 (1983). Due diligence is defined as: "Such measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent [person] under the particular circumstances; not measured by any absolute standard, but depending upon the relative facts of the special case."

---

**16.** The negligence to which Defendant Vernay refers is discussed above in the section on Plain-

tiff's comparative negligence. *See supra* section IIB(3).

Black's Law Dictionary (6th ed. 1990). Although Plaintiff's failure to leave the bilge pump in the automatic position under the circumstances of this case may have constituted lack of due diligence, the Court does not find that there was clearly no obligation for the insurer to pay for Plaintiff's loss. The vessel sank at its berth due to an unanticipated fracture in its exhaust tube. The vessel had been surveyed recently by a surveyor engaged by the marine insurance company and was found to be in "A–1" condition. There is no suggestion that misuse of the vessel caused the crack in the Vernatube. Although the activation of the automatic bilge pump may have decreased the amount of damage the vessel suffered, it had nothing to do with the cause of the water entry into the vessel. Therefore, Plaintiff's marine insurer was not a volunteer when it made payment under the policy.

## III. DAMAGES

The usual measure of damages is either the cost of repair or the diminution in value of the damaged property. Because the damage to the SEA FEVER was repairable, the Court will use the cost of repair to determine the proper amount of damages. *See Smith v. Urethane Installations, Inc.,* 492 A.2d 1266, 1269 (Me.1985). As a result of the sinking of the vessel SEA FEVER, the parties have stipulated that Plaintiff, by his insurers, incurred fair and reasonable repair costs as follows: $45,612.74 for machinery and electronic repair,[17] $4,945.50 for employment of a salvor to raise the vessel, and $7,472.90 for a marine survey, for a total of $58,031.14. Ex. B Joint Stipulation 14 (Docket No. 45). In addition to the stipulated amount of damages, the record reveals that Plaintiff's marine insurer allowed $32,500 for repairs for the water damage done to the deck and superstructure of the SEA FEVER.[18] The water saturation repairs to the

superstructure of the SEA FEVER were never undertaken by Sullivan, and the vessel was sold in August 1992 for $110,000. Tr. Vol. I at 55, 72. The Court finds that the total amount of damages sustained by Plaintiff is $90,531.14.

Although the parties have agreed on the dollar amount of the repairs, they are not in agreement on whether those amounts are properly includable in the calculation of damages. One of the costs being challenged by Defendant Vernay is the $32,500 allowed for repairs to the deck and superstructure of the vessel. Plaintiff never undertook to make these repairs before he sold the SEA FEVER in the summer of 1992. Defendant Vernay contends that there was no diminution in value to the SEA FEVER from the water damage. To support this argument, Vernay points to the fact that Sullivan sold SEA FEVER for $110,000 in August 1992. Vernay's argument is not persuasive on this point. Evidence that Sullivan was able to sell SEA FEVER for more than it may have been worth does not contradict the evidence establishing the damage sustained by the deck and superstructure as a result of the sinking. Vernay also objects to the inclusion of the marine survey costs as an element of damages. The Court finds that the marine survey costs did not include preparation of this case for litigation and are thus properly includable in the award of damages.

Because the Court finds that Plaintiff voluntarily and unreasonably proceeded to encounter a known danger, his own negligent conduct can be taken into account when determining the proper amount of an award of damages on Plaintiff's strict liability claim. *See Austin v. Raybestos–Manhattan, Inc.,* 471 A.2d 280, 287 (Me.1984). It is an open question under Maine law whether a plaintiff's negligence may operate to reduce recovery in breach-of-implied-warranty

---

**17.** The machinery repair costs included an allowance for rebuilding the main engine and exhaust. Instead of rebuilding the main engine and wet exhaust system, Sullivan requested that a new engine and dry exhaust system be installed at an additional cost to him of $6,800. Tr. Vol. I at 54.

**18.** During the course of repairs to the machinery and electronic equipment, water saturation damage to the deck and superstructure became apparent. Tr. Vol. I at 205. The repair estimates submitted for the water saturation damage were $38,500 and $41,267.57. Exs. 76, 506. The parties have stipulated that these repair estimates represent fair and reasonable costs for repair of the water saturation damage. Tr. Vol. II at 109–10.

cases. *See Dongo v. Banks,* 448 A.2d 885, 891 (Me.1982) (expressly declining to decide issue). In this case, the Court will take Plaintiff's negligence into account when deciding the amount of recovery on the warranty claims. Plaintiff's comparative fault is determined to be forty percent (40%). Because Plaintiff's comparative fault will be taken into consideration on each count, the total damage award against Defendant Vernay is reduced by forty percent (40%). 14 M.R.S.A. § 156. Accordingly, it is hereby *ORDERED* that judgment be entered in favor of Plaintiff Rodney Sullivan in the amount of Fifty–Four Thousand Three Hundred and Eighteen Dollars and Sixty–Eight Cents ($54,318.68).[19]

---

19. The Court has considered Defendant Young Brothers' request for reimbursement of its attorney fees and costs. The Court, finding these fees and expenses to be ordinary and necessary costs of litigation, denies Young Brothers' request.