USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1876 RODNEY A. SULLIVAN, Plaintiff - Appellee, v. YOUNG BROTHERS & COMPANY, INC., Defendant - Appellee. ____________________ VERNAY PRODUCTS, INC., Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Cyr, Circuit Judge, _____________ and Skinner,* Senior District Judge. _____________________ _____________________ Richard L. Suter, with whom Preti, Flaherty, Beliveau & _________________ _____________________________ Pachios was on brief for appellant. _______ John R. Bass II, with whom Thompson, McNaboe, Ashley & Bull _______________ ________________________________ was on brief for appellee Rodney A. Sullivan; Barry K. Mills, _______________ with whom Hale & Hamlin was on brief for appellee Young Brothers _____________ & Company, Inc. ____________________ August 1, 1996 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. TORRUELLA, Chief Judge. This products liability action TORRUELLA, Chief Judge. ___________ arose out of the sinking of the lobster vessel, the SEA FEVER. The vessel's owner and operator, Rodney Sullivan ("Sullivan"), by his insurer, brought this suit to recover for damages sustained due to the SEA FEVER's sinking. Sullivan brought suit against Vernay Products, Inc. ("Vernay") and Young Brothers and Company Inc. ("Young Brothers") under theories of strict liability, negligence, and breach of implied and express warranties. Young Brothers crossclaimed against Vernay for indemnification and contribution, and Vernay similarly crossclaimed against Young Brothers for indemnification and contribution. The district court found only Vernay to be liable for the damages caused by the SEA FEVER's sinking and awarded damages to Sullivan in the amount of $54,318.68. On the crossclaim, it entered judgment in favor of Young Brothers. Before us is Vernay's appeal of the district court's judgment, damage award, and denial of its motion for summary judgment and motions for judgment as a matter of law. Also before us is Sullivan's cross-appeal of the district court's finding that Young Brothers was not liable. For the reasons stated below, we affirm, in part, and reverse, in part, the judgment below. I. BACKGROUND I. BACKGROUND __________ We take the facts, particularly the more technical aspects, almost verbatim from the district court's detailed opinion.  -2- The SEA FEVER is a forty-foot, fiberglass hull lobster boat built by Young Brothers in 1989, which Sullivan purchased new from Young Brothers in February 1990 for $122,000. Sullivan added various items of gear and furnishings at a cost of approximately $10,000. Young Brothers built the SEA FEVER with a wet exhaust system, which was composed, in part, of six-inch diameter Vernatube fiberglass marine wet exhaust tubing manufactured by Vernay Products (the "Vernatube"), which is a manufacturer of various fiberglass components of marine wet exhaust systems. H & H Propeller Shop ("H & H Propeller" or "H & H"),1 Vernay's distributor in Maine, was the parts supplier from which Young Brothers purchased the Vernatube installed aboard the SEA FEVER.  The SEA FEVER's wet exhaust system was constructed with a fifteen-foot length of Vernatube. Because Vernatube is sold in ten-foot lengths, Young Brothers fiberglassed together a ten-foot and a five-foot length of Vernatube, making, in effect, a single length of tube. This span of Vernatube was connected to the engine at the exhaust manifold by a flexible rubber hose and rigidly installed in the hull of the vessel by fiberglass where the Vernatube passed through the fish hold bulkhead, the lazarette bulkhead, and the transom. Aft of the manifold, it was also fiberglassed to each of the two bulkheads and the transom  ____________________ 1 Sullivan's complaint included claims against H & H Propeller under theories of strict liability and breach of express and implied warranties. Before trial began, those claims, along with crossclaims and third-party claims brought by and against H & H Propeller, were dismissed by stipulation of the parties. -3- and the Vernatube exhaust was supported by a 3/4-inch marine plywood bracket lined with urethane rubber at about the midway point of the fish hold. The district court found that the SEA FEVER's Vernatube wet exhaust system was installed in conformity with generally accepted methods of installation among builders of similar vessels in Maine. The SEA FEVER was also equipped with a Rule 1500 gallon automatic bilge pump. This pump, which was capable of discharging up to 1500 gallons of water per hour, could be operated manually or automatically.  Sullivan operated the SEA FEVER as a commercial lobster vessel during the 1990 fishing season without significant problems. In early 1991, Sullivan discovered a crack (the "1991 crack") in the portion of the Vernatube exhaust located in the lazarette, which permitted water to enter the vessel to the point of near sinking. Sullivan discovered the crack because the bilge pump was running more than usual. At the time, the boat was tied to the dock and fully loaded with 90-100 lobster traps, such that the wet exhaust tubing was completely submerged. Sullivan notified Young Brothers of this crack, and Young Brothers repaired it by fiberglassing over the break. Young Brothers also notified H & H Propeller of the crack. Neither of these companies notified Vernay of this crack, and there was no evidence that Sullivan did. The cause of this crack was never investigated or discovered.  After this repair, the SEA FEVER operated without further problems and Sullivan fished the 1991 season until -4- January 1992. Thereafter, the SEA FEVER remained at her slip until March 1992, when it was hauled for routine maintenance. While the SEA FEVER was out of the water, Sullivan did not specifically inspect the exhaust system. The record shows that the last time he inspected it was at the end of the summer of 1991. On March 17, 1992, Edward S. Blackmore, a marine surveyor appointed by Sullivan's marine hull insurance company, surveyed the SEA FEVER. Blackmore found the vessel to be in "A-1" condition with a fair market value of $130,000. Blackmore's inspection included observation of the Vernatube exhaust, which did not have any water in it at the time of the inspection as the SEA FEVER was not loaded. Nothing unusual was noted about the condition of the Vernatube and Blackmore observed no fractures, no discoloration, and no staining or other evidence of failure in the Vernatube.  After the March maintenance and inspection, the SEA FEVER was not operated and remained at her slip until April 4, 1992. On that day, Sullivan and his sternman made an eight-to-ten-mile trip aboard the SEA FEVER, picking up approximately eighty lobster traps. After returning, they tied the SEA FEVER to the dock at about 1:00 p.m. and went home for the day. Due to the weight of the lobster traps, the end of the exhaust discharge port was several inches under water and, as a result, the Vernatube had water in it. The SEA FEVER was left with the automatic bilge pump switch in the "off" position rather than the "automatic" one. Later that day, at approximately 7:30 -5- p.m., Sullivan was notified that the SEA FEVER had sunk at the dock. Sullivan retained Wayne Godfrey, a salvage diver from D & G Diving Services, to raise the vessel, which was approximately 90% to 95% submerged. The SEA FEVER was surveyed by Werner Splettstoesser of Marine Safety Consultants on behalf of Sullivan's insurer, who determined that the SEA FEVER sank due to ,  a crack in the wet exhaust tubing which was visible from the access hatch to the fish hold compartment. This suit followed. On July 26, 1995, after a four-day bench trial, the district court issued its written decision and order, in which it found that the cause of the SEA FEVER's sinking was a full circumference crack in the Vernatube located a few inches forward of the bulkhead between the lazarette and fish hold (the "1992 crack"). The district court further found that this crack was a fatigue failure caused by tension stresses over time exceeding the axial length of the tube. As there was no other known instance prior to the lawsuit in which a Vernatube had cracked under similar circumstances, much of the trial testimony was directed at the question of whether the 1992 crack had been caused by a defective section of Vernatube or by improper installation of the exhaust system by Young Brothers.  After evaluation of expert testimony offered by all three parties, review of the largely technical evidence, and inspection and analysis of the SEA FEVER's Vernatube, the district court found that the ten-foot section of the Vernatube, which developed at least two cracks during a two-year period, was -6- defective. The district court specifically found that the evidence regarding the Vernatube's porosity, wall thickness, and longitudinal strength "clearly proves that the section of Vernatube was defective" and that its defect contributed to the Vernatube's failure in the SEA FEVER. In particular, the district court found that with respect to these physical measures, the Vernatube did not live up to the specifications described in the Vernay Products Information Sheet (the "VPIS"). In making its finding, the district court noted that inspection of the Vernatube revealed several cracks, delamination, and areas of prospective failure, all located in the ten-foot section as well as one area of debonding (i.e., where strands of fiber had come loose). The district court explicitly ruled out other claimed reasons for the Vernatube's failure, noting that there was no evidence of owner misuse and no indication of Vernatube failures in boats similarly constructed. Noting that the trial testimony "clearly established that hundreds of boats of similar design have been constructed with this type of rigid exhaust system without one known failure," the district court found that the rigid installation of SEA FEVER's exhaust system was not a cause of the Vernatube's failure and that, therefore, Young Brothers was not strictly liable for its installation of the wet exhaust system. In making this finding, the district court noted that "the existence of multiple failures and imperfections within the single ten-foot section of Vernatube, notwithstanding the product's known track record of problem-free similar -7- installations in hundreds of other vessels, supports the conclusion that the SEA FEVER sank because this particular length of tube, rather than its installation, was defective." In addition, the district court held that (i) Vernay's warning against rigid installation, while insufficient, did not give rise to recovery -- but Vernay was nonetheless liable under theories of negligence and strict liability based on defects in tubing; (ii) Sullivan was partially responsible for damage due to his failure to leave his boat's bilge pump in automatic position despite knowing of another crack in the Vernatube exhaust that needed repair; (iii) Vernay was also liable for breach of express and implied warranties; (iv) Sullivan's notice to Young Brothers was sufficient to allow recovery for breach of warranty by Vernay; and (v) Sullivan's recovery would be reduced by 40% to reflect his comparative fault. The district court entered an amended judgment on July 28, 1995, based on its earlier decision and order. The district court had subject matter jurisdiction based on diversity of citizenship and satisfaction of the jurisdictional amount. See 28 U.S.C. 1332(a). We have jurisdiction pursuant to 29 ___ U.S.C. 1291 (appeals from a district court's final judgment).  II. DISCUSSION II. DISCUSSION __________ After a bench trial, we review the trier's factual determinations for clear error, see Smith v. F.W. Morse & Co., 76 ___ _____ ________________ F.3d 413, 420 (1st Cir. 1996); Cumpiano v. Banco Santander P.R., ________ _____________________ 902 F.2d 148, 152 (1st Cir. 1990); Fed. R. Civ. P. 52(a), but -8- afford plenary review to the trier's formulation of applicable legal rules, see Smith, 76 F.3d at 420; Johnson v. Watts ___ _____ _______ _____ Regulator Co., 63 F.3d 1129, 1132 (1st Cir. 1995). The ______________ jurisprudence of clear error prevents us from ruling anew on factual issues. See, e.g., Jackson v. Harvard Univ., 900 F.2d ___ ____ _______ _____________ 464, 466 (1st Cir.), cert. denied, 498 U.S. 848 (1990); Keyes v. ____________ _____ Secretary of the Navy, 853 F.2d 1016, 1019 (1st Cir. 1988). _____________________ This case comprises interrelated issues of liability involving three players. The basic outline of the flurry of claims is as follows. Vernay contests the district court's ruling that it was liable under theories of warranty, both express and implied, as well as strict liability for product defects and negligence. Furthermore, Vernay argues that the district court erred in rejecting the argument that Young Brothers' negligence constitutes a defense to Vernay's liability. Additionally, Vernay argues that the district court erred in failing to conclude that Sullivan's own conduct should have operated to bar Vernay's liability, rather than occasion a 40% reduction. Finally, Vernay argues that the district court erred in finding Young Brothers to be without liability under any of Sullivan's theories. Sullivan rejects Vernay's arguments that we should reverse the district court's conclusions with respect to Vernay's liability to him. Moreover, Sullivan contends that the district court correctly did not bar his recovery due to his own conduct. Sullivan also argues that the district court erred in finding -9- that Young Brothers was not liable under theories of breach of warranty and strict liability for product defects, although Sullivan contends that the district court correctly concluded that Young Brothers was not liable under a negligence theory. For its part, Young Brothers argues that the district court correctly decided that it was not liable and that Vernay was. We address first Vernay's liability, then Young Brothers' liability. Issues of Sullivan's conduct are discussed as they apply to the other two parties' liability. Following our liability discussions, we turn to issues of damages. A. Vernay's Liability A. Vernay's Liability The district court found that Vernay breached certain express and implied warranties in the sale of the Vernatube to Young Brothers, all in violation of Me. Rev. Stat. Ann. tit. 11, 2-313 (express warranty), 2-314 (implied warranty of merchantability), and 2-315 (implied warranty of fitness for a particular purpose), and that Vernay was also liable under theories of strict liability for product defects and negligence. The district court arrived at its conclusions after making extensive findings regarding the Vernatube and the VPIS which were based both on trial testimony, exhibits entered into evidence and the parties' joint stipulations, dated June 1, 1994 ("Joint Stipulations"). On appeal, Vernay challenges, for a number of reasons, the district court's conclusions that Vernay is liable for breach of express warranties, breach of implied warranties, and strict liability for product defects.  -10- Breach of Express Warranty Breach of Express Warranty __________________________ Pursuant to the Maine Uniform Commercial Code, express warranties by the seller are created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Me. Rev. Stat. Ann. tit. 11, 2-313. Furthermore, "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Id. In general, the question whether __ certain language creates an express warranty is reserved for the trier of fact. See Cuthbertson v. Clark Equip. Co., 448 A.2d ___ ___________ _________________ 315, 320 (Me. 1982). Below, Sullivan contended that: the Vernatube had insufficient nominal wall thickness; the Vernatube was porous on the inner surface, affecting the tube's overall integrity; and the longitudinal strength was insufficient for the application and could have been increased through changes in the tube's manufacture. Based on an extensive review of the technical evidence presented, the district court agreed, finding that the deficiency in the nominal wall thickness and the substandard longitudinal strength were not what Vernay expressly warranted in its VPIS, and that the porous nature of the inner surface of the Vernatube contributed to the weakening of the fibers and the fatigue crack which caused the vessel to sink. -11- The district court ultimately concluded that the "breach of these express warranties was collectively the cause of the failure of this section of Vernatube." Vernay challenges the district court's conclusion that it breached an express warranty arising from the VPIS on several grounds. We reject all of them. First, Vernay points out that neither Sullivan nor Young Brothers pled any violation of an express warranty arising from the VPIS. Sullivan only pled a violation of the express and implied warranties of merchantability and fitness for a particular purpose, and Young Brothers only pled a breach of an implied warranty of merchantability. Accordingly, Vernay argues, the district court erred when it held Vernay breached certain express warranties made in the VPIS. We do not agree.  Under Fed. R. Civ. P. 15(b),2 we find that the express warranty arising from the VPIS was tried by implied, if not express, consent of the parties and, thus, we "treat[] [it] in all respects as if [it] had been raised in the pleadings." Id.; ___ see Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal ___ _______  ____________________ 2 Fed. R. Civ. P. 15(b) provides, in pertinent part:  When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.  -12- Practice and Procedure: Civil 2d 1493 (1990) ("Rule 15(b) does ________________________________ not require that a conforming amendment be made and there is no penalty for failing to do so."). In his pretrial memorandum, Sullivan argues that Vernay Products breached certain express warranties in connection with the sale of the Vernatube, citing to Me. Rev. Stat. Ann. tit. 11, 2-313 and referring to the statements made in the VPIS. Although in its pretrial memorandum Vernay did point out, albeit somewhat in passing and without reference to any legal rule, that Sullivan had not originally pled breach of an express warranty arising from the VPIS, we find that, because issues relating to both express and implied warranties arising from the VPIS were tried interchangeably and without further objection, the breach of an express warranty arising from the VPIS was tried by implied, if not express, consent under Fed. R. Civ. P. 15(b). The record shows that Vernay did not object to the presentation of evidence regarding express warranties made in the VPIS, and that Vernay itself introduced considerable testimony regarding its interpretation of the VPIS.  Furthermore, we are unpersuaded by Vernay's counterargument that, because the VPIS was only admitted and discussed for purposes of the strict liability claim's failure to warn issue, its failure to object to the admission of the VPIS or to related testimony cannot be deemed an implied consent to amend the pleadings. Not only was the evidence and testimony regarding the VPIS related directly to the breach of warranties claims that -13- Sullivan and Young Brothers had pled, but Vernay failed to raise any sort of objection or state for the record that it was not consenting to Sullivan's claim of a breach of an express warranty claim arising from the VPIS. In addition, Vernay's counsel explicitly admitted to the breach of warranties claims, without reference to the fact that an express warranty arising from the VPIS had not been pled: In support of defendants' motion for judgment as a matter of law, Vernay's counsel stated that "[w]ell, we have a breach of contract account here, but I would say there is [an] absolute defense to Vernay under [Me. Rev. Stat. Ann. tit. 11, ] 2-607(3)" given that Vernay was not given notice of the defect. (6/21/94 Tr. p. 223). In any event, even assuming, arguendo, that Vernay had not consented to the ________ amendment of the pleadings, it does not affect the outcome of the appeal as we nonetheless affirm the district court's findings that Vernay breached the express and implied warranties which had originally been pled. Second, Vernay argues that, even if a breach of express warranty is deemed to have been pled, there was no evidence proffered at trial to show that either Young Brothers or Sullivan relied on the representations made in the VPIS. In support of his argument, Vernay cites Phillips v. Ripley & Fletcher Co., 541 ________ _____________________ A.2d 946, 950 (Me. 1988), and cases from other jurisdictions for the proposition that reliance is an element of a breach of express warranty claim in Maine. As Phillips notes, comments to ________ Me. Rev. Stat. Ann. tit. 11, 2-313 suggest that "the -14- requirement that the affirmation become part of the 'basis of the bargain' is meant to continue the uniform sales act requirement that the purchaser must show reliance on the affirmation in order to make out a cause of action for breach of warranty." Phillips, ________ 541 A.2d at 950 (internal citations omitted).  Although the district court did not explicitly discuss reliance as an element of the breach of express warranty claim in its memorandum, testimony was given that Young Brothers relied on the VPIS. The following colloquy ensued between counsel for Sullivan and Colby Young, part owner and vice president of Young Brothers: Q. Is it fair to state that you made the decision to change your installation practice and use vernatubing for your wet exhaust tube based upon the representations set forth in the [VPIS]? A. Yes, sir. . . .  Q. So [sic] in other words, your decision to use the vernatube was based upon the content of the information set forth in [the VPIS]?  A. That's correct. . . . Q. If Vernay in its brochure had told you that a rigid installation was improper, you wouldn't have done it? A. Certainly not. It never would have been done.  (6/21/94 Tr. T. at 199, 203). Following up on this and other testimony by Young, counsel for Vernay engaged in this exchange with Young:  Q. Mr. Young, you said that you relied on this document to decide whether or not to install Vernay in your first boat; isn't that right? -15- A. That and the representation from the rep [from H & H Propeller], yes. Q. Okay. So you relied on things that [the representative] from H & H Propeller Shop, Inc. told you? A. In fact, he brought it to us and asked us to try it, yes. Q. You say that [the VPIS] is the only thing that Vernay gave you? A. Yes. (6/21/94 Tr. T. at 207).  Based on Young's testimony, including cross-examination by Vernay's counsel, we conclude that the district court could have reasonably inferred reliance. Thus, although the district court did not explicitly address reliance, we nonetheless affirm the breach of an express warranty claim based on the record evidence and the failure of Vernay's counsel to object to it, finding that the district court's failure amounts to harmless error in this case, since the failure to make findings of fact and conclusions of law dealt here with an issue on which most relevant facts are undisputed and the law can be applied without the district court's assistance. See Conservation Law Found. v. ___ ________________________ Busey, 79 F.3d 1250, 1271 (1st Cir. 1996); Associated Elec. _____ _________________ Coop., Inc. v. Mid-America Transp. Co., 931 F.2d 1266, 1272 (8th ___________ ________________________ Cir. 1991).  Lack of Privity Lack of Privity _______________ We dismiss as meritless Vernay's next claim that Sullivan may not enforce the express warranty because there was no evidence proffered that Sullivan "ever saw" the VPIS prior to litigation, let alone relied on its representations. In Maine, "[l]ack of privity between plaintiff and defendant shall be no -16- defense in any action brought against the manufacturer, seller or supplier of goods for breach of warranty, express or implied, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods." Me. Rev. Stat. Ann. tit. 11, 2- 318 (1995); see Stanley v. Schiavi Mobile Homes, Inc., 462 A.2d ___ _______ ___________________________ 1144, 1147 n.4 (Me. 1983) (noting that lack of privity is no defense in breach of implied warranty actions). Although there is a lack of privity between Sullivan and Vernay in that Sullivan did not purchase the Vernatube directly from Vernay, Sullivan was certainly a person whom Vernay might reasonably have expected to use, or be affected by, the Vernatube. Indeed, Vernay itself stipulated to this very fact. See Joint Stipulations, No. 6. ___ Even without the stipulation, the record supports this finding. As Vernay points out in its brief, approximately 70-75% of its products are sold directly to boat builders and the rest are sold to wholesale distributors and engine dealerships. H & H Propeller Shop was Vernay's distributor in Maine and the parts supplier from which Young Brothers purchased the Vernatube installed aboard the SEA FEVER. As a purchaser of a new vessel from a Maine boat building company which purchased goods from Vernay's Maine distributor, Sullivan was certainly a person whom Vernay might reasonably expect to use, or be affected by, its product. Notice Requirement Notice Requirement __________________ -17- Vernay contends that the district court erred in holding it liable under a breach of warranty theory, arguing that it cannot be held responsible for the damages because Sullivan failed to comply with the notice requirements set forth in Me. Rev. Stat. Ann. tit. 11, 2-607(3). That section requires that, where the tender has been accepted, the buyer must notify the seller of any breach within a reasonable time after he or she discovered or should have discovered any breach or be barred from any remedy. Id., 2-607(3). The "seller" is defined as "a ___ person who sells or contracts to sell goods." Me. Rev. Stat. Ann. tit. 11, 2-103(d). The district court found that Sullivan satisfied the notice requirement, because he notified Young Brothers, his immediate seller, of the 1991 crack.  On appeal Vernay contends -- as it did below -- that Sullivan is barred from any remedy because he failed to notify Vernay of the undisputed 1991 crack which caused water to enter the SEA FEVER's holds. Vernay argues as follows: If the 1992 crack is considered to be a breach of any warranty then the similar 1991 crack must also be considered a breach and, because it is undisputed that neither Sullivan nor Young Brothers provided Vernay with any notice of the 1991 crack,3 Sullivan is barred from any remedy. For support, Vernay argues that "the majority of courts" have held that for claims of economic loss, remote manufacturers must be notified, and that notice to the  ____________________ 3 As the district court noted, although Young Brothers did notify H & H Propeller of the 1991 crack, H & H did not notify Vernay. -18- seller of the product alone is insufficient for purposes of Section 2-607(3). The consequence of not receiving notice of the first crack, Vernay explains, is that it never had an opportunity to offer a cure. See Me. Rev. Stat. Ann. tit. 11, 2-605. The ___ district court rejected Vernay's argument, concluding that the majority of courts in fact have held that buyers need only notify their immediate sellers. Sullivan, 893 F. Supp. at 1159 ________ (collecting cases). However, Vernay disputes the cases that the district court cited, and argues that a majority of courts hold the opposite. However, even accepting, arguendo, Vernay's argument, ________ the record supports the conclusion that Vernay had constructive notice and knowledge of the 1991 crack. As the district court noted when denying defendants' motion for judgment as a matter of law, viewing the evidence in the light most favorable to the plaintiff -- as the verdict here requires us to -- a fact finder could conclude that Vernay was effectively notified via communication to H & H Propeller, Vernay's representative in Maine. The district court concluded, and we agree, that a fact finder could reasonably infer that the representative had the apparent authority to accept reports for Vernay and that notice given to that agent was effectively constructive knowledge to Vernay, who retained that representative and that company as its exclusive representative in Maine. Finally, Vernay raises an additional argument based on the district court's finding that Sullivan was aware of a new -19- crack in 1992 which he "had been meaning to repair." Vernay now contends that because there is no evidence that Sullivan provided anyone with notice of the 1992 crack prior to the sinking, Sullivan is barred from any remedy. Vernay further contends that on the facts of this case (namely, that the 1991 crack almost resulted in the sinking of the SEA FEVER and the new crack had the potential to do the same), reasonable notice of this new crack could be nothing less than immediate notice. Vernay has failed to adduce legal authority for the proposition that, under Maine's version of Article 2 of the UCC, Sullivan's failure to give immediate notice voids his claim. In contrast, an applicable comment to the UCC states that: "[a] reasonable time" for notification from a retail consumer is to be judged by different standards [than notice from a merchant buyer], . . . for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy. Uniform Commercial Code, 2-607.4 cmt. In this case, where the 1992 crack had given Sullivan no indication of trouble, we must reject Vernay's "immediate notice" gloss on what constitutes "a reasonable time." To adopt Vernay's reading would require consumers to give notice of problems that amount to little more than a nuisance, and would tend to defeat worthy claims with little off-setting benefit to anyone. Even if consumers were to comply with this burden, manufacturers would be deluged with notices about harmless defects. In light of the UCC comment's -20- apt caution regarding the notice requirement and retail consumers, we think that it would be unwise to shift the balance in this flow of information in the manner that Vernay urges. As a result, we uphold the district court's conclusion that Vernay was liable for breach of its express warranties regarding the Vernatube's nominal wall thickness, porosity of its inner surface, and longitudinal strength. Furthermore, given the expert testimony heard by the district court, its finding of causation cannot be clear error. See Clement v. United States, ___ _______ _____________ 980 F.2d 48, 53 (1st. Cir. 1992) (stating that, under Maine law, causation-in-fact is a factual inquiry); Greenstreet v. Brown, ___________ _____ 623 A.2d 1270, 1271 (Me. 1993) (stating that "[p]roximate cause is a question of fact" and "[w]e will not disturb the trial court's finding of fact unless there is no competent evidence in the record to support it"); LaFerriere v. Paradis, 293 A.2d 526, __________ _______ 528-29 (Me. 1972). Because we uphold the district court's finding of Vernay's liability based on a breach of its express warranty, we need not consider Vernay's liability with respect to theories of implied warranty, or with respect to negligence or strict liability for product defects.4 See Dudley v. Bungee ___ ______ ______  ____________________ 4 We taken no position, however, on the question of whether Sullivan's loss constitutes purely "economic loss" under Oceanside. We note in passing that, with respect to Vernay's _________ liability under theories of negligence or strict liability, we express no opinion as to the district court's assertion that "the [Maine] Law Court has not decided th[e] issue" of the economic loss doctrine's applicability to recoveries under such theories, Sullivan v. Young Bros. & Co., 893 F. Supp. 1148, 1153 (D. Me. ________ __________________ 1995), in light of Oceanside at Pine Point Condo. Ass'n v. _______________________________________ Peachtree Doors, Inc., 659 A.2d 267, 270-71 (Me. 1995) (decided _____________________ two months prior to Sullivan) (stating that "plaintiffs may not ________ -21- Int'l Mfg., 76 F.3d 372, 1996 WL 36977, *2, (4th Cir. 1996) (per __________ curiam) (finding it "unnecessary to address the question of whether labelling on the [product] created any express warranties," since the court had affirmed claim for compensatory damages on a negligence count); Compton v. Wyle Laboratories, 674 _______ _________________ F.2d 206, 208 n.1 (4th Cir. 1982) (declining to address alternate theory of breach of warranty on which plaintiff had prevailed below, since the court of appeals affirmed district court's finding of liability based on negligence); Drayton v. Jiffee _______ ______ Chem. Corp., 591 F.2d 352, 358 (6th Cir. 1978) (upholding ____________ district court's conclusion of liability solely on breach of express warranty grounds, without ruling with respect to court of appeals' concerns regarding district court's conclusions of liability on bases of breach of implied warranty, strict liability and negligent design).5  ____________________ recover for [economic] damages in tort"). 5 Vernay also contends that the district court's judgment should be reversed because Sullivan's insurers made payments to Sullivan as "volunteers" and were under no contractual obligation to do so, but we think this argument is without merit. As Vernay itself states in its brief, an insurer is a "volunteer" and without rights to subrogation only if it pays its insureds when it clearly has no obligation to do so under its policy. See, _______ ___ e.g., Allstate Ins. Co. v. Quinn Constr. Co., 713 F. Supp. 35, 38 ____ _________________ _________________ (D. Mass. 1989) (stating that an insurer "could be characterized as a volunteer only if it paid [insured] when it clearly had no obligation to do so," and any "doubt . . . is construed in favor of the insurer and the nonexistence of a volunteer status"). The purpose of this rule is "to encourage insurers to settle promptly claims that appear to be valid." Id. To be sure, Vernay asserts ___ that because Sullivan's policy states that recovery shall be made "provided such loss or damage has not resulted from want of due diligence by the assured," the insurer acted as a volunteer in paying Sullivan despite his negligent conduct. However, we conclude that the district court did not err in concluding that -22- Sullivan's Conduct Sullivan's Conduct __________________ Vernay also appeals the district court's finding that its acts were the proximate cause of Sullivan's injuries. Vernay contends that Sullivan's own actions were an intervening and superseding cause of his loss. Because proximate cause is a factual inquiry, the district court's determination must stand unless it is clearly erroneous. See Clement, 980 F.2d at 53 ___ _______ ("[c]ausation-in-fact is, by definition a factual inquiry" under Maine law); Greenstreet, 623 A.2d at 1271 ("[p]roximate cause is ___________ a question of fact"). The district court ruled that the breach of the express warranties was collectively the cause of the failure of the Vernatube, which in turn caused the complained-of harm. Sullivan, 893 F. Supp. at 1159. Vernay correctly identifies ________ evidence that Sullivan's own actions could have contributed to the SEA FEVER's sinking. However, the district court also considered expert testimony regarding the Vernatube's physical defects and their role in the SEA FEVER's sinking. Furthermore, the district court reduced Sullivan's recovery accordingly. Based on our review of this evidence, we conclude that there was sufficient evidence to render the district court's conclusion reasonable. As a result, we cannot conclude that the district court's finding that Vernay proximately caused the complained-of  ____________________ any consequent argument that the insurer was not necessarily required to pay Sullivan was not sufficiently compelling to meet the legal standard that the insurer clearly had no obligation to _______ pay. -23- harm was clearly erroneous. Accordingly, we affirm the district court's conclusion that Vernay is liable to Sullivan for breach of its express warranty. We note in passing that we do not opine on whether Sullivan's recovery under a breach of express warranty theory could appropriately be reduced under comparative negligence principles, since Sullivan does not cross-appeal the reduction. As the district court properly noted, whether such a reduction is permissible regarding a breach-of-warranty theory is an "open question under Maine law." Sullivan, 893 F. Supp. at 1161 ________ (citing Dongo v. Banks, 448 A.2d 885, 891 (Me. 1982) (expressly _____ _____ declining to decide the issue of whether plaintiff's negligence is or should be a defense to an action for breach of implied warranty)). The district court reduced Sullivan's recovery under both express warranty and implied warranty theories on the basis of trends in case law applying comparative negligence principles to actions for breach of implied warranties. Id. We neither _______ ___ adopt nor reject the principle that express warranties implicate the same interests as implied warranties with respect to this question.6 Rather, we uphold the reduction of Sullivan's award  ____________________ 6 Some courts have apparently extended comparative negligence principles to actions for breach of express warranties. See, ___ e.g., Haysville U.S.D. No. 261 v. GAF Corp., 233 Kan. 635, 644, ____ _________________________ _________ 666 P.2d 192, 201 (1983); Interwest Constr. v. Palmer, 886 P.2d _________________ ______ 92, 99-100 (Ct. App. Utah 1994); see also Merritt Logan, Inc. v. ________ ___________________ Fleming Cos., 901 F.2d 349, 365 (3d Cir. 1990) (construing New ____________ Jersey statutes to authorize consideration of comparative negligence in assessing damages for breach of warranty, without stating whether holding applies to express warranties). But see _______ Shaffer v. Debbas, 21 Cal. Rptr. 2d 110, 114 (Cal. Ct. App. 1993) _______ ______ (stating that "comparative negligence is not a defense to a -24- because of his waiver by failing to cross-appeal. As a result, we caution that our decision to allow a reduction under an express warranty theory for comparative negligence does not stand for an endorsement of comparative negligence's applicability to express warranty theory-based claims. B. Young Brothers' Liability B. Young Brothers' Liability Vernay argues that the district court erred in finding no liability on the part of Young Brothers on theories of negligence, implied warranty and strict liability. Sullivan also argues that the district court correctly found no liability on Young Brothers' part under a negligence theory, but that the district court erred in finding Young Brothers not liable for breach of implied warranty. We address Young Brothers' liability on each of these theories in turn. Negligence  Negligence __________ Vernay argues that the district court erred in finding no liability on Young Brothers' part under a negligence theory. Vernay makes a two-part argument. First, Vernay argues that Young Brothers was negligent in its design and building of the SEA FEVER. Second, Vernay contends that Young Brothers was negligent in its conduct after the SEA FEVER had been delivered to Sullivan. With respect to Vernay's first argument, we affirm the district court's conclusion that Young Brothers was not negligent in designing and building the SEA FEVER. Vernay points out that  ____________________ breach of express warranty action"). -25- Young Brothers used a rigid installation of the Vernatube, disregarding written boat building standards, and that the district court heard testimony disapproving of such installation methods. But the district court also heard testimony of others in the industry to the effect that the installation of Vernatube in the SEA FEVER was typical of customary installation practices in Maine7 -- and custom within the boat building profession is a factor relevant to the standard of care owed by Young Brothers. See Restatement (Second) of Torts 294A (1965). The district ___ court also heard testimony as to the relatively trouble-free operation of Vernatube generally with rigid installation. While Vernay may wish it otherwise, ours is not the task of crediting witnesses, see Coastal Fuels of Puerto Rico, Inc. v. Caribbean ___ ____________________________________ _________ Petroleum Corp., 79 F.3d 182, 195 (1st Cir. 1996); Wytrwal v. _______________ _______ Saco Sch. Bd., 70 F.3d 165, 171 (1st Cir. 1995), and the _______________ testimony of these witnesses, we conclude, justified the district court's conclusion that Young Brothers acted without negligence, see The T.J. Hooper, 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.) ___ ________________ (stating that the court should not find that the "whole [boat building] calling may have unduly lagged" without good reason), cert. denied, 287 U.S. 662 (1932). ____________  ____________________ 7 In fact, another boat builder testified that he had been "in every boatyard up and down the Maine coast" and he had "never seen it done differently." See Sullivan, 893 F. Supp. at 1157. ___ ________ Additionally, Vernay's distributor in Maine testified that 90% of boat builders install Vernatube in the same way as it was installed in SEA FEVER. Id.  ___ -26- Vernay also contends that Young Brothers was negligent in failing to notify Vernay regarding the 1991 crack. We dismiss this argument for the same reason that we dismissed Vernay's claim that Vernay is not liable because it was not notified of the 1991 crack. In fact, Sullivan notified Young Brothers, and Young Brothers in turn notified H & H Propellers, Vernay's Maine distributor and the supplier from whom Young Brothers purchased the Vernatube. In light of this notice to Vernay's distributor, we cannot accept the contention that Young Brothers was somehow negligent in its handling of the 1991 crack. Vernay also argues that Young Brothers was negligent in not finding the cause of this crack; however, one must possess a duty before one can breach it, and as Vernay has not pointed to authority showing that Young Brothers owed a duty beyond notifying its supplier, we reject this contention. As a result, we conclude that Young Brothers cannot be held liable under a negligence theory. Implied Warranty and Strict Liability Implied Warranty and Strict Liability _____________________________________ Vernay argues that the district court erred in finding Vernay liable and Young Brothers not liable under theories of implied warranty and strict liability. Vernay argues that the district court erred by concluding that Vernay was liable under a theory of implied warranty, while Young Brothers did not breach its implied warranty that the vessel would be fit for its ordinary use. Additionally, according to Vernay, both of these parties participated in the sale of the allegedly defective Vernatube, and therefore, it is impossible for Vernay to be held -27- strictly liable and Young Brothers not to be held strictly liable. The district court correctly concluded that Young Brothers could not be found liable for breach of an implied warranty of merchantability. Maine's version of Article 2 of the UCC provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Me. ___________________________________ Rev. Stat. Ann. tit. 11, 2-314(1) (emphasis added). In Suminski ________ v. Maine Appliance Warehouse, 602 A.2d 1173 (Me. 1992), the Maine _________________________ Law Court interpreted the phrase "goods of that kind." Id. at ___ 1175 (discussing section 2-314(1)). The Law Court concluded that a defective switch that did not affect use of a television for more than a year did not render a seller of televisions liable for breach of an implied warranty. In particular, the Law Court stated that the sale of a major appliance with a switch that fails more than a year later cannot support a finding that the entire appliance was unmerchantable when sold. To use an automotive example, an unmerchantable battery may not render an entire vehicle unmerchantable. Suminski, 602 A.2d at 1175. We conclude, similarly, that in the ________ instant case, where the Vernatube did not impede use of the SEA FEVER for more than one year, and Young Brothers sells boats, not Vernatube, Young Brothers cannot be held liable for breach of an implied warranty of fitness for ordinary purposes. -28- However, we cannot agree with the district court's conclusion that Young Brothers was not strictly liable to Sullivan. Maine's strict liability statute provides that [o]ne who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property . . . . This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller. Me. Rev. Stat. Ann. tit. 14, 221. The district court concluded that Young Brothers was not strictly liable because "the rigid installation of SEA FEVER's exhaust system was not a cause of the ___________ failure in the Vernatube." Sullivan, 893 F. Supp. at 1155. This ________ conclusion cannot be reconciled with the statute's explicit direction that a seller's liability attaches notwithstanding the seller's exercise of "all possible care." If the Vernatube section was "defective" and "unreasonably dangerous," as the district court suggests in its opinion, it would be immaterial that Young Brothers' own actions did not cause Sullivan's injuries. As a result, we must vacate the district court's judgment that Young Brothers was not liable to Sullivan under a strict liability theory. Young Brothers' sole apparent argument to rebut the conclusion that it is strictly liable to Sullivan is that, based -29- on Suminski, Young Brothers' should be considered a seller of ________ boats, not the Vernatube in the boats. As discussed above, Suminski applies on its face to allegations that an implied ________ warranty of merchantability has been violated, not to theories of strict liability. Suminski, 602 A.2d at 1175. We decline to so ________ greatly extend Suminski's reach, and as a result we must grant ________ judgment to Sullivan against Young Brothers under a theory of strict liability. As the parties have neither briefed nor argued Maine indemnification law among tortfeasors, we remand to the district court for further proceedings regarding Young Brothers' rights to indemnity from Sullivan.  C. Damages C. Damages Vernay also challenges the district court's computation of Sullivan's damages. In particular, Vernay takes issue with the district court's choice of the cost of repair rather than diminution in the value of the damaged property. Under Maine law, both measures may be used to prove the amount of damages. See Paine v. Spottiswoode, 612 A.2d 235, 240 (Me. 1992). ___ _____ ____________ "Generally, we will not substitute our judgment for that of the [factfinder] in assessing damages and will not disturb the [factfinder's] damage award unless that award is a product of bias, prejudice, improper influence, or was reached under a mistake of law or in disregard of the facts." Bradford ________ v. Dumond, ___ A.2d ___, ___, 1996 WL 242615, at *5 (Me. 1996); ______ Currier v. Cyr, 570 A.2d 1205, 1210 (Me. 1990). The district _______ ___ court "is entitled to act upon probable and inferential as well -30- as direct and positive proof in determining damages." Bradford, ________ 1996 WL 242615, at *5; Cyr, 570 A.2d at 1210. In the present ___ case, we think that the district court was justified in relying on the undisputed costs of Plaintiff's initial loss investigation, the cost of a salvor to raise the SEA FEVER, Plaintiff's repair costs for the vessel's machinery, and the insurer's estimate of water damage to the deck and superstructure of the vessel. As a result, we do not think that the district court's estimate of Plaintiff's loss, reduced for Plaintiff's own comparative negligence,8 of $54,318.68 can be said to have been made in disregard of the facts. And certainly, no contention has been made that the award was the product of bias, prejudice or improper influence.  However, we conclude that a mistake of law compels reduction of the award by $5,000 -- the amount of the settlement between H & H Propellers and Sullivan. Under Maine Law, when a person seeks recovery for property damage caused by two or more parties, if a settlement or release is made with one party, "the trial judge shall reduce the verdict [against the non-settling or non-releasing party or parties] by an amount equal to the settlement with or the consideration for the release of the other [party or parties]." Emery Waterhouse Co. v. Lea, 467 A.2d 986, ____________________ ___ 995 (Me. 1983). The district court neglected to take the settlement with H & H Propellers into account in fixing the  ____________________ 8 See, supra n.6. ___ _____ -31- verdict. As a result, the verdict against Vernay must be reduced to $49.318.68. CONCLUSION CONCLUSION __________ For the foregoing reasons, the district court's decision is affirmed in part and reversed in part. No costs to affirmed in part reversed in part. ________________ ________________ any party. -32-