STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
Docket No. CV-2020-0104

BANSC-CV-2020-00104

April Delgreco, )
          Plaintiff )
                  )
v. )
                  )
                  )
Bangor Humane Society, )
          Defendant. )

**ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

In this action, plaintiff April Delgreco's four-count complaint against defendant Bangor Humane Society (BHS) alleges negligence, breach of an express warranty, liability under 7 M.R.S. § 3961(1), and common law strict liability. All four causes of action arise from an incident that occurred on May 4, 2018, at Ms. Delgreco's friend's apartment, where a dog the friend had recently adopted from BHS, attacked Delgreco and inflicted serious injuries. BHS seeks summary judgment on the grounds that Delgreco will be unable to present a prima facie case at trial on her claims. Delgreco has timely opposed the motion and both parties have submitted statements of fact under M.R. Civ. P. 56.

## Standard of Review

Summary judgment is appropriate when the record shows that no genuine dispute exists concerning the material facts of the case and the moving party demonstrates that it is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). A fact is considered "material" when it has the potential to affect the outcome of the case. *Lougee Conservancy v. City Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774. A "genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth." *Holmes v. E. Me. Med. Ctr.*, 2019 ME 84, ¶ 15, 208.

1

A.3d 792. In determining whether to grant a motion for summary judgment, the Court's analysis is limited to those facts which the parties have properly set forth in their respective statements of fact[1] and the portions of the affidavits and other record materials referenced in those statements. *See e.g., Holmes*, 2019 ME 84, ¶ 14, 208 A.3d 792; *Berry v. Mainstream Fin.*, 2019 ME 27, ¶ 7, 202 A.3d 1195 ("[F]acts not set forth in the statement of material facts are not in the summary judgment record, even if the fact in question can be gleaned from affidavits or other documents attached to, and even referred to in portions of, a statement of material fact."). The Court considers the facts set forth in the summary judgment record in the light most favorable to the non-moving party. *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 7, 129 A.3d 944. Any doubt as to whether a genuine issue of material fact exists "will be resolved against the movant, and the opposing party will be given the benefit of any inferences which might reasonably be drawn from the evidence." 3 Harvey & Merritt, *Maine Civil Practice* § 56:6 at 242 (3d, 2018-2019 ed.); *Beaulieu v. Aube Corp.*, 2002 ME 79, ¶ 2, 796 A.2d 683 (ambiguities in the record are resolved in favor of the nonmovant).

Where, as here, a defendant moves for summary judgment on one or more of the plaintiff's causes of action, the initial burden rests on the defendant to show through a properly supported statement of facts and legal memorandum that the material facts of the case are not in genuine dispute and the plaintiff is unable to present a prima facie case. *Holmes*, 2019 ME 84, ¶ 16, 208 A.3d 792 (where the

---

1 These 'statements of fact' may include and are limited to the following documents: a supporting statement of material facts (S.M.F.) filed by the moving party, the nonmoving party's opposition to the moving party's statement of material facts (Opp. S.M.F.), the nonmoving party's statement of additional facts (S.A.F.) in opposition, and the moving party's reply to the nonmoving party's S.A.F. M.R. Civ. P. 56(h). The particular procedural rules governing the parties' presentation of facts in those statements are found mainly in M.R. Civ. Pa. 56(e)-(h).

moving part is the defendant "the burden rests on that party to show that the evidence fails to establish a prima facie case for each element of the cause of action"); *Maine Civil Practice* § 56:6 at 242 ("The party seeking the summary judgment has the burden of demonstrating clearly that there is no genuine issue of material fact."). If the moving party's motion satisfies this initial burden, the nonmoving plaintiff must then respond to the motion by producing the evidence necessary to support "a prima facie case for each element of [his or her] cause[s] of action." *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774; M.R. Civ. P. 56(e). This standard requires "proof only of enough evidence to allow the [trier-of-fact] to infer the fact at issue and rule in the party's favor." *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774. The standard does not require the evidence to be persuasive. *Id.*; *see also Estate of Smith v. Cumberland Cty.*, 2013 ME 13, ¶ 19, 60 A.3d 759. However, proof that rises only to the level of conjecture and speculation is not sufficient to meet this standard. *See Addy v. Jenkins Inc.*, 2009 ME 46, ¶¶ 14-15, 969 A.2d 935; *Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509. If the plaintiff fails to satisfy the above burden, the defendant is entitled to summary judgment. *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774.

## Background

On January 23, 2018, a dog named Chumley was surrendered to BHS. (Def.'s Supp.'g S.M.F. ¶ 1.) The surrendering owner identified the dog's breed to BHS as a shepherd and American Bulldog mix. (Def.'s S.M.F. ¶ 6.) When a dog is surrendered to BHS, BHS staff take the following steps before making the dog available for adoption: (1) a staff member completes a Surrender Intake and Canine Personality Profile with the surrendering owner; (2) the dog is vaccinated for kennel cough; (3) the dog receives

3

a medical and behavioral evaluation; (4) the dog is spayed or neutered; (5) and various other paperwork is completed. (*Id.* ¶ 2.)

To assess dogs' personalities, BHS uses the Meet Your Match SAFER behavioral evaluation developed by the American Society for the Prevention of Cruelty to Animals. (*Id.* ¶ 11.) BHS's animal care coordinator, Samantha Carruth, completed the behavioral evaluation for Chumley on February 2, 2018. (*Id.* ¶ 13.) Carruth recorded that, during her assessment, Chumley was energetic, pulled away from eye contact, loved to be petted, playfully jumped, wagged his tail during play, pulled away and growled when pain was inflicted on his paw, and stiffened but did not otherwise react to human infringement upon his food bowl. (*Id.* ¶ 15.) Carruth further described Chumley as a very strong large dog, a good dog, active, energetic, playful, slobbery, very jumpy, and great in the car. (*Id.* ¶ 16.) BHS's Adoption Counselor, Bethany Ward, completed a Canine Personality Profile for Chumley, with the surrendering owner, on January 23, 2018. (*Id.* ¶ 4.) The Profile discloses that in the summer of 2017, a kitten had neared Chumley's food, and Chumley had responded by killing the kitten. (*Id.* ¶ 5.) Based on the above, and other information taken during Chumley's intake phase, Carruth created a Placement Specification for Chumley. (*Id.* ¶¶ 19-23.) He was made available to the public for adoption on February 14, 2018. (*Id.* ¶ 23.) Carruth believed that Chumley would be a good fit for a person with experience handling large power-breed dogs. (*Id.* ¶ 21.)

In May of 2018, Delgreco's friend, Alisha Kavanagh, became interested in adopting a dog. (*Id.* ¶¶ 25-26.) On May 4, 2018, she went to BHS with Delgreco to see what dogs were available. (*Id.*) Kavanagh spoke with BHS staff, described herself as active outdoors, and indicated that she preferred a dog that was enthusiastic, playful, but also laid back. (*Id.* ¶¶ 30-31.) BHS's Adoption Counselor, Ms. Ward, had

4

interacted with Chumley on a daily basis during the four months he had been at BHS. (*Id.* ¶¶ 32.) She found him to be energetic when outside but laid-back after exercise, and she had never seen Chumley exhibit any aggressive behavior. (*Id.* ¶¶ 33, 35.) She believed Chumley and Kavanagh "could be a fit" and provided Kavanagh with Chumley's Canine Personality Profile, Meet Your Match SAFER Assessment, Placement Specifications, medical evaluation, and related adoption paperwork. (*Id.* ¶¶ 39-41.) Kavanagh, Delgreco, and Ward then viewed the dogs in BHS's kennels for 15 to 20 minutes, during which Kavanaugh indicated an interest in two dogs, a coonhound and Chumley. (*Id.* ¶¶ 42-43.) Kavanaugh and Delgreco further interacted with Chumley in Ward's presence for approximately 15 minutes or more on BHS's property. (*Id.* ¶¶ 46-47.) During this "meet and greet," Kavanagh expressed that she was impressed with Chumley's behavior and found him "very docile and sociable." (*Id.* ¶ 47.)

At the end of the "meet and greet," Ward asked whether Kavanagh wanted to adopt Chumley. (*Id.* ¶ 48.) Kavanagh responded that Chumley seemed really friendly but inquired as to whether his breeding was part pit bull. (*Id.* ¶ 49.) Ward responded by telling her that BHS was sure that Chumley was not part pit bull and provided her with BHS paperwork identifying the dog as an American Bulldog/German Shepherd mix. (*Id.* ¶ 50.) Kavanagh then took the steps necessary to adopt Chumley from BHS. (*Id.* ¶ 53-57.) During that process, Kavanagh was presented with an Adoption Contract from BHS, which she read, indicated that she understood, and signed. (*Id.* ¶¶ 55-56.) Kavanagh also paid an adoption fee to BHS. (*Id.* ¶ 57.) Kavanagh then left BHS with Chumley. (*Id.* ¶ 58.)

At her deposition, Kavanagh testified that when she left BHS with Chumley after adopting him on May 4, 2018, she knew that he was now her dog, that she owned him, and that she was responsible for him. (*Id.* ¶ 60) After Kavanagh adopted

5

Chumley from BHS, Delgreco observed Chumley three or four times in and around Kavanagh's apartment and found him to be "happy and content." (Def.'s S.M.F. ¶ 63.)

On May 5, 2018, a day after the adoption was completed, Kavanagh invited Delgreco over to her apartment for coffee. (*Id.* ¶ 65.) As Delgreco entered the apartment, Chumley greeted her by jumping and licking her face. (*Id.* ¶ 66.) Sometime later, Chumley bit Delgreco in the face. (*Id.* ¶ 68.) Delgreco was completely surprised when Chumley bit her; all of her interactions with the dog before had been friendly and he had not exhibited any aggressive behavior. (*Id.* ¶ 67.) There is no genuine dispute that when Chumley bit Delgreco, Kavanagh owned the dog, had responsibility for him, and possessed him. (*Id.* ¶¶ 72-73; Pl.'s Opp. S.M.F. ¶¶ 72-73.). Based on the deposition testimony, there is also no dispute that Delgreco agreed, Chumley had been adopted by Kavanagh and was in Kavanagh's custody. (Def.'s S.M.F. ¶ 73; Pl.'s Opp. S.M.F. ¶ 73.) After Chumley bit Delgreco, Kavanagh responded by calling a law enforcement officer and, when he responded, asking him to shoot Chumley. (Def.'s S.M.F. ¶ 70; Pl.'s Opp. S.M.F. ¶ 70.) Chumley was then taken to Blake Veterinary Hospital. (Pl.'s S.A.F. ¶ 15.) He was euthanized after Kavanagh had called the hospital to insist he be put down and BHS had paid for the procedure. (Pl.'s S.A.F. ¶ 15; Def.'s Reply to Pl.'s S.A.F. ¶ 15.)

The Adoption Contract that Kavanagh and BHS entered into includes the following terms:

- Kavanagh agrees that she "understand[s] that he Bangor Humane Society can make no guarantees regarding the health, behavior, temperament, or financial commitment required by pets made available for adoption."

- Kavanagh agrees that "by adopting [Chumley], [she] agree[s] to assume all responsibilities of this animal from this point forward, financially and

6

otherwise, regarding the care of this animal. Therefore, [she] release[s] BHS from any future financial liability regarding this animal."

- Kavanagh agrees that she is "aware that there is no exception to this agreement" and that she "release[s] and waive[s] any right against [BHS] that I may have now or in the future for any financial liabilities incurred by medical bills, or damages to person or property caused by this animal."

- "BHS remains fully committed to each animal adopted from us. From this point forward, as the new owner, you [, Ms. Kavanagh,] assume full responsibility for this animal, financial and otherwise. However, if at any time you decide you are unable to fufill you obligation to the animal, we welcome you to bring him or her back at no additional cost to you."

(Def.'s S.M.F. ¶¶ 75, 81-84.) Regarding the last bullet point, the parties agree that it was BHS's policy "to accept, at any time, the return of an animal from its adopter if the adopter wanted to return the animal" and that, when she adopted Chumley, Kavanagh understood that she could return him to BHS at any time. (Def.'s S.M.F. ¶¶ 74-76; Pl.'s Opp. S.M.F. ¶¶ 74-76.)

## Analysis

### A. Plaintiff's Personal Injury Claims

Maine recognizes three separate legal theories under which a plaintiff who has suffered damages from a dog bite may obtain relief: common law strict liability, common law negligence, and statutory liability under 7 M.R.S. § 3961. *See Morgan v. Marquis*, 2012 ME 106, ¶¶ 7-17, 50 A.3d 1. In this action, Ms. Delgreco advances all three of those theories, pleading them in separate counts. The Court will address each theory in turn.

7

## 1. Common Law Negligence (Count I)

A prima facie case of negligence requires proof of the following elements: (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the plaintiff suffered an injury proximately caused by the defendant's breach of duty. *Parrish v. Wright*, 2003 ME 90, ¶ 18, 828 A.2d 778; *Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951. "A duty is an obligation, to which the law will give recognition and effect, to conform to a particular manner of conduct toward another." *Parrish*, 2003 ME 90, ¶ 18, 828 A.2d 778. Whether a defendant owed a duty is a question of law for the court to determine. *Id.*

In *Fields v. Hayden*, 2013 ME 93, ¶ 8, 81 A.3d 367, Maine's Law Court, after reviewing its previous cases on the subject, reaffirmed its position "that a person owes a duty of care to another from any unreasonable risk of harm posed by the foreseeable actions of a dog only if that dog is in the person's possession or under the person's control." *See also Morgan*, 2012 ME 106, ¶¶ 3-4, 10, 50 A.3d 1 (dog owners owed a duty to a dog-sitter injured by their dog); *Parrish*, 2003 ME 90, ¶¶ 2-3, 19-20, 828 A.2d 778 (defendants owed no duty to a neighbor who was injured by a dog owned by the defendants' adult daughter when the adult daughter was staying at defendants' house); *Stewart v. Aldrich*, 2002 ME 16, ¶ 1, 788 A.2d 603 (a defendant landlord owed no duty to an invitee injured by a dog owned by and under the control of the landlord's tenants).

Delgreco has advanced several arguments why BHS owed a duty to Delgreco at the time of the incident. She argues BHS owed a duty because BHS knew that Chumley had previously killed a kitten who had neared his food bowl and tended to be very territorial. (Pl.'s Opp. to Def.'s Mot. Summ. J. 4; Pl.'s S.A.F. ¶¶ 3-5.) Delgreco argues that BHS owed a duty to the general public because it knew that Chumley had

8

kennel cough and was on a medication (Clavamox) that Plaintiff claims can cause dogs to act in an unusual aggressive manner. (Pl.'s Opp. to Def.'s Mot. Summ. J. 4; Pl.'s S.A.F. ¶¶ 1-2, 20-21.) She also argues, without citing supporting legal authority, that BHS retained control and ownership of Chumley per the following provision in Kavanagh and BHS's Adoption Contract:

> BHS remains fully committed to each animal adopted from us. From this point forward, as the new owner, you assume full responsibility for this animal, financial and otherwise. However, if at any time you decide you are unable to fullfill your obligation to the animal, we welcome you to bring him or her back at no additional cost to you.

(Pl.'s Opp. to Def.'s Mot. Summ. J. 12-14; Def.'s S.M.F. ¶ 75.) Delgreco argues that the above language "demonstrates the conditional nature of [Kavanagh's property interest in Chumley]." (Pl.'s Opp. 14.) She also points to the fact that, after Kavanagh surrendered Chumley to law enforcement after he bit Delgreco, BHS instructed the Blake Veterinary Hospital to euthanize Chumley and paid for the procedure. (Pl.'s Opp. 12-14. Pl.'s S.A.F. ¶¶ 15-16.) She further argues that the fact that BHS refunds its fee for adopting a dog if the dog is returned within the first five days of adoption shows that BHS owned and controlled Chumley. (Pl.'s Opp. 13.) She also argues that the concept of "ownership of an animal" is a legal concept that a non-attorney would not understand. (Id.)

All of Delgreco's theories are negated by the uncontroverted evidence in the record that BHS did not own Chumley or have any control over him when he bit Delgreco at Kavanagh's apartment. Before the incident, Kavanagh had adopted Chumley from BHS. BHS and Kavanagh had signed a contract that memorialized the adoption and confirmed that Kavanagh assumed full responsibility for Chumley. Kavanagh admitted at her deposition that she had adopted Chumley, she was the dog's owner, she was responsible for him, and she had possession of him. In Maine, "a

9

person owes a duty of care to another from any unreasonable risk of harm posed by the foreseeable actions of a dog only if that dog is in the person's possession or under the person's control." *Fields v. Hayden*, 2013 ME 93, ¶ 8, 81 A.3d 367. The above facts in BHS's S.M.F. showing that Kavanagh had adopted Chumley and was in possession and control of him as his owner at the time of the incident have not been controverted.

Plaintiff's arguments regarding the adoption contract and euthanasia do not raise a genuine issue as to whether Chumley was in Kavanagh's possession and control and not BHS's. The contract is not ambiguous. It states in direct terms, agreed to by Kavanagh, that "from this point forward" Kavanagh is the "new owner" of Chumley with "full responsibility" for him. The terms allowing for return of the animal would allow BHS to regain ownership, but do not mean that BHS maintained any ownership, control, or possession after Kavanaugh's adoption. The plain language of the contract compels this conclusion as does the contract read as a whole. It is also confirmed by Kavanagh's stated understanding of the transaction.

Even as viewed in the light most favorable to Delgreco, the facts cannot generate a genuine dispute: at the time of the incident, Chumley was in Kavanagh's possession and control and not in BHS's. The Court therefore grants BHS's motion for summary judgment on count I.

## 2. Common Law Strict Liability (Count III)

Maine has adopted Restatement (Second) of Torts § 509 as the basis for common law strict liability claims for damages caused by a dog. *Morgan v. Marquis*, 2012 ME 106, ¶ 7, 50 A.3d 1. The Restatement section offers the following:

> (1) A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to

10

liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.

(2) This liability is limited to harm that results from the abnormally dangerous  propensity of which the possessor knows or has reason to know.

RESTATEMENT (SECOND) OF TORTS § 509 (1977); *Morgan*, 2012 ME 106, ¶ 7, 50 A.3d 1.

As discussed in the previous section, Kavanagh possessed Chumley at the time of the incident and BHS did not.   The Court grants Defendant's motion for summary judgment on count III.

### 3. Statutory Liability (Count IV)

In count IV of her complaint, Delgreco alleges that BHS is liable under 7 M.R.S. 3961(1).  (Compl. ¶ 37.) The statute provides:

1. Injuries and damages by animal. When an animal damages a person or that person's property due to negligence of the animal's owner or keeper, the owner or keeper of that animal is liable in a civil action to the person injured for the amount of damage done if the damage was not occasioned through the fault of the person injured.

7 M.R.S. § 3961(1).  For purposes of the statute, a "keeper" is "a person in possession or control of a dog or other animal." 7 M.R.S. § 3907(16); *Morgan*, 2012 ME 106, ¶ 12, 50 A.3d 1.  Because there is no genuine dispute in the record that BHS was not the owner or keeper of Chumley at the time of the incident, the Court grants BHS summary judgment on count IV.

### B. Plaintiff's Claim for Breach of an Express Warranty (Count II)

In count II, Delgreco advances a claim that does not depend on BHS having retained ownership or possession of the dog.   She alleges BHS is liable to her for breaching an express warranty it made to Kavanagh "as to Chumley being an appropriate match for Kavanagh." (Compl. ¶ 32.)  Breach of an express warranty is a

11

contract-based claim. 11 M.R.S. § 2-313;[2] *Town of Winthrop v. Bailey Bros.*, CV-12-0313, 2014 Me. Super. LEXIS 34, at *10 (Mar. 18, 2014). An express warranty is created when "any affirmation of fact or promise made by the seller to the buyer which relates to the goods becomes part of the basis of the bargain or when any description of the goods is made part of the basis of the bargain." *Guiggey v. Bombardier*, 615 A.2d 1169, 1172 (Me. 1992) (citations omitted). To establish a breach of an express warranty, "a plaintiff has the burden to establish the following: 1) seller made statements or representations amounting to express warranties concerning the quality and fitness of the product; 2) these express warranties were part of the bargain; 3) the product sold did not possess the quality and fitness to the extent warranted by seller; and 4) the breach of express warranty was the cause of the damages to the buyer)." *Bailey Bros.*, 2014 Me. Super. LEXIS 34, at *10 (citing *Sullivan v. Young Bros. & Co. Inc.*, 893 F. Supp. 1148, 1159 (D. Me. 1995) *aff'd in part, rev'd in part*, 91 F.3d 242 (1st Cir. 1996)).

Delgreco was not a party to the contract between Kavanagh and BHS. Accordingly, to sustain her claim against BHS, she must establish not only a breach but that she is an intended third-party beneficiary of the contract. *See F.O. Bailey Co. v. Ledgewood, Inc.*, 603 A.2d 466, 468 (Me. 1992); *Martin v. Scott Paper Co.*, 511 A.2d 1048, 1049-50 (Me. 1986). This means Delgreco must produce prima facie proof that Kavanagh, as the promisee in the bargain, intended Delgreco to receive the benefit of Kavanagh's contract with BHS. The Restatement (Second) of Contracts provides:

> Unless otherwise agreed between promisor and promissee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either: (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the

---

2 This Maine statute is taken verbatim from U.C.C. § 2-313.

circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981). In her opposition, Delgreco asserts that she is an intended beneficiary but she offers neither argument nor authority to support her assertion. (Pl.'s Opp. to Def.'s Mot. Summ. J. 4-7.) The contract does not identify a third-party beneficiary. Neither of the parties to the contract stated she was. No third-party beneficiary, Delgreco or otherwise, can be inferred from the facts set forth by the parties in their respective statements of fact. The Court must therefore grant summary judgment to BHS on count II.

## Conclusion and Order

Three of the theories of recovery Delgreco advances require a showing that BHS retained an element of possession or ownership of the dog when it bit Delgreco. The undisputed facts show the opposite. Neither did the contract between Kavanagh and BHS give any right of action to Delgreco. For these reasons, the Court must grant summary judgment to BHS on all four counts of Delgreco's complaint.

So ordered.

The Clerk may incorporate this Order upon the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: May 12, 2023
    Entered on the docket: 05/17/2023

The Hon. Bruce C. Mallonee
Justice, Maine Superior Court

13